**LEVINE SULLIVAN KOCH & SCHULZ, LLP**
ROBERT PENCHINA (admitted *Pro Hac Vice*)
    rpenchina@lskslaw.com
321 West 44th Street, Suite 1000
New York, NY 10036
Telephone:  (212) 850-6100
Fax:  (212) 850-6299

THOMAS CURLEY (admitted *Pro Hac Vice*)
    tcurley@lskslaw.com
1899 L Street, N.W., Suite 200
Washington, DC 20036
Telephone:  (202) 508-1138
Fax:  (202) 861-8999

**JASSY VICK CAROLAN LLP**
KEVIN L. VICK, Cal. Bar No. 220738
    kvick@jassyvick.com
JEAN-PAUL JASSY, Cal. Bar No. 205513
    jpjassy@jassyvick.com
6605 Hollywood Boulevard, Suite 100
Los Angeles, California 90028
Telephone:  (310) 870-7048
Fax:  (310) 870-7010

Attorneys for Defendant
GAWKER MEDIA, LLC

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA –   WESTERN DIVISION

| | |
|---|---|
| QUENTIN TARANTINO,<br><br>                        Plaintiff,<br><br>        v.<br><br>GAWKER MEDIA, LLC, et al.,<br><br>                        Defendants. | Case No.  CV 14-603-JFW (FFMx)<br><br>Judge:   Hon. John F. Walter<br><br>**DEFENDANT GAWKER MEDIA, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS THE COMPLAINT PURSUANT TO F.R.C.P. RULE 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Request for Judicial Notice Filed Concurrently]<br><br><br>Date:       April 14, 2014<br>Time:       1:30 p.m.<br>Place:      Courtroom 16 |

TO THE COURT, THE PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on April 14, 2014 at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 16 of the above-entitled Court, the Honorable John F. Walter, presiding, defendant Gawker Media, LLC. ("Gawker" or "defendant") will and hereby does move the Court under the Federal Rules of Civil Procedure, Rule 12(b)(6) for an order dismissing the Complaint of plaintiff Quentin Tarantino ("Tarantino" or "plaintiff").

A conference pursuant to Local Rule 7-3 took place on February 12, 2014.

Gawker's Motion to Dismiss ("Motion") is made on the following grounds: pursuant to Rule 12(b)(6), plaintiff has failed to state a claim for contributory copyright infringement upon which relief can be granted.  Contributory infringement cannot exist in the absence of a direct infringement.  Plaintiff has not alleged any non-conclusory facts establishing any direct infringement by third parties, or that Gawker induced or contributed to that infringement.  Moreover, even if unauthorized use by third parties could be established, Gawker's news report containing links to already extant copies of plaintiff's work was a non-infringing fair use pursuant to 17 U.S.C. § 107.  Plaintiff's claim for punitive damages should be dismissed because such relief is unavailable under the Copyright Act.

Gawker's Motion is based on this Notice, the attached Memorandum of Points and Authorities, on all papers, pleadings, records and files in this case, on all matters of which judicial notice may be taken, and on such other evidence and/or argument as may be presented to the Court at the hearing on this Motion.

Gawker respectfully requests that the Court dismiss the Complaint, and each claim for relief contained therein against Gawker, with prejudice and without leave to amend.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DATED:  March 10, 2014

LEVINE SULLIVAN KOCH & SCHULZ, LLP
ROBERT PENCHINA *
THOMAS CURLEY *

JASSY VICK CAROLAN LLP
KEVIN L. VICK
JEAN-PAUL JASSY

By:   /s/     Robert Penchina

ROBERT PENCHINA

Attorneys for Defendant
GAWKER MEDIA, LLC

* admitted *Pro Hac Vice*

-ii-

GAWKER MEDIA, LLC'S
MOTION TO DISMISS COMPLAINT

1

# <u>TABLE OF CONTENTS</u>

SUMMARY OF ARGUMENT ...................................................................................1

FACTUAL BACKGROUND ...................................................................................2

ARGUMENT ...........................................................................................................4

I.   THE COMPLAINT FAILS TO STATE A CLAIM FOR
     CONTRIBUTORY COPYRIGHT INFRINGEMENT ....................................4

II.  GAWKER'S LINKS TO PLAINTIFF'S CONTENT
     AS PART OF A NEWS REPORT ARE FAIR USE .........................................4

     A.   The purpose and character of Gawker's use favors a finding of
          fair use .................................................................................................12

          1.   Gawker's Use Was For the Purpose of News Reporting ............12

          2.   Gawker's Use Was Transformative .............................................14

          3.   Gawker's Use Was at Most Incidentally Commercial.................16

          4.   Gawker's Readers' Use Was For a Proper Purpose.....................17

     B.   The nature of the copyrighted work weighs slightly in favor of
          fair use or is neutral .............................................................................18

     C.   The amount and substantiality of the portion used weighs in
          favor of a finding of fair use.................................................................20

     D.   The effect of the use upon the potential market weighs in favor
          of a finding of fair use .........................................................................22

     E.   The balance of the factors, taken together with the public
          interest, demonstrates that fair use was made .......................................23

III. PLAINTIFF'S PRAYER FOR RELIEF REGARDING PUNITIVE
     DAMAGES SHOULD BE DISMISSED ........................................................25

CONCLUSION ......................................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-iii-

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)...................... 10

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d. 868 (2009)......................... 6, 8, 9

*Bernstein v. JC Penney, Inc.*,
    No. 98-2958 R EX, 1998 WL 906644 (C.D. Cal. Sept. 29, 1998).....................7

*Berry v. Deutsche Bank Trust Co. Ams.*,
    No. 07 CIV. 7634 (WHP), 2008 WL 4694968 (S.D.N.Y. Oct. 21, 2008) ...........7

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ....................................................... 20

*Burnett v. Twentieth Century Fox Film Corp.*,
    491 F. Supp. 2d 962 (C.D. Cal. 2007) ...................................................... 11, 21

*Calkins v. Playboy Enters. Int'l, Inc.*,
    561 F. Supp. 2d 1136 (E.D. Cal. 2008) ...................................................... *passim*

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994)......................... *passim*

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013)...................................................... 24

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
    109 F.3d 1394 (9th Cir. 1997) .................................................................. 18, 22

*Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983 (9th Cir. 2009).............5

*eAdGear, Inc. v. Liu*,
    No. CV-11-05398 JCS, 2012 WL 2367805 (N.D. Cal. Jun. 21, 2012)......... 4, 20

*Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622 (9th Cir. 2003) ......... 16

*Flava Works, Inc. v. Clavio*,
    No. 11-cv-05100, 2012 WL 2459146 (N.D. Ill. Jun. 27, 2012) ..........................7

*Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012)................................ 7, 21

*Fox Broad. Co., Inc. v. Dish Network L.L.C.*,
   No. 12-57048, --- F.3d ---, 2014 WL 260572 (9th Cir. July. 24, 2013) .......... 17

*Goldberg v. Cameron*, 787 F. Supp. 2d 1013 (N.D. Cal. 2011) ..............................5

*Harper & Row Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 558 (1985)................................. 19

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
   796 F.2d 1148 (9th Cir. 1986) .................................................... 10, 24

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) ........................... *passim*

*Krisel v. Contempo Homes, Inc.*,
   No. 0600507, 2006 WL 5668181 (C.D. Cal. Sept. 27, 2006) ......................... 25

*Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522 (9th Cir. 2008) ................. 11

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
   964 F.2d 965 (9th Cir. 1992) ........................................................ 11

*Los Angeles News Serv. v. CBS Broad., Inc.*,
   305 F.3d 924, *as amended*, 313 F.3d 1093 (9th Cir. 2002) ...................... 12, 23

*Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068 (9th Cir. 2013) ..................5

*Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003) .......... 22, 24

*MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir. 1981) ................................... 22

*Med-Systems, Inc. v. Masterson Mktg., Inc.*,
   No. 11-cv-695, 2011 WL 5873399 (S.D. Cal. Nov. 23, 2011)............................6

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005)..................................8

*Micro Star v. Formgen Inc.*, 154 F.3d 1107 (9th Cir. 1998) ................................ 11

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012).............. 19, 21, 22

*Muench Photography, Inc. v. Pearson Educ., Inc.*,
   No. 13–cv–03937, 2013 WL 6172953 (N.D. Cal. Nov. 25, 2013) ....................8

*Northland Family Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform*,
   868 F. Supp. 2d 962 (C.D. Cal. 2012) ....................................... 14, 24

-v-

*Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000) ................. 15, 19

*NXIVM Corp. v. Ross Inst.*, 364 F.3d 471 (2d Cir. 2004) ........................................ 12

*Oboler v. Goldin*, 714 F.2d 211 (2d Cir. 1983) ........................................ 25

*Online Policy Grp. v. Diebold, Inc.*,
    337 F. Supp. 2d 1195 (N.D. Cal. 2004) ........................................ 11, 14

*Panoramic Stock Images, Ltd. v. Pearson Educ., Inc.*,
    No. 12 CV 9918, 2013 WL 2357586 (N.D. Ill. May 29, 2013) ..........................7

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ............. *passim*

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007) ....................5

*Reinicke v. Creative Empire, LLC*,
    No. 12-cv-1405, 2013 WL 275900 (S.D. Cal. Jan. 24, 2013) .......................... 25

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
    907 F. Supp. 1361 (N.D. Cal. 1995) ........................................ 11, 21

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
    923 F. Supp. 1231 (N.D. Cal. 1995) ........................................ 18

*Salt Optics, Inc. v. Jand, Inc.*,
    No. 10-0828, 2010 WL 4961702 (C.D. Cal. Nov. 19, 2010) ...............................9

*Saregama India Ltd. v. Young*,
    No. CV 02 9856 RJK, 2003 WL 25769784 (C.D. Cal. Mar. 11, 2003) ........... 25

*Sedgwick Claims Mgmt. Servs., Inc. v. Delsman*,
    No. C 09–1468 SBA, 2009 WL 2157573 (N.D. Cal. 2009) ........................ 11, 15

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ..................... 10

*Sega Enters. Ltd. v. MAPHIA*, 948 F. Supp. 923 (N.D. Cal. 1996) ....................... 11

*Seltzer v. Green Day, Inc.*, 725 F.3d 1170 (9th Cir. 2013) ............................... 22, 23

*Shepard v. Miler*,
    No. Civ-10-1863, 2010 WL 5205108 (E.D. Cal. Dec. 15, 2010) ...................... 11

*Simonyan v. Ally Fin. Inc.*,
    No. 12-8495, 2013 WL 45453 (C.D. Cal. Jan. 3, 2013) ................................. 6, 9

-vi-

*SOFA Entm't., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273 (9th Cir. 2013).......... 16

*Solis v. City of Fresno*,
  No. 11-CV-00053, 2012 WL 868681 (E.D. Cal. Mar. 13, 2012).........................8

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984).............................. 21, 24

*Stern v. Does*,
  No. CV 09-01986, 2011 WL 997230 (C.D. Cal. Feb. 10, 2011) ..................... 15

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  No. 12-2412-CV, --- F.3d ---, 2014 WL 274407
  (2d Cir. Jan. 27, 2014)............................................................... *passim*

*Twentieth Century Music Corp. v. Aiken*,
  422 U.S. 151, 95 S. Ct. 2040, 45 L. Ed. 2d 84 (1975)....................................... 24

*Viesti Assocs., Inc. v. Pearson Educ., Inc.*,
  No. 12-CV-02240-PAB-DW, 2013 WL 4052024 (D. Colo. Aug. 12, 2013) ......8

*Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689 (9th Cir. 2009)..............................8

*Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir. 1991) .................................. 12

**Statutes & Other Authorities**

17 U.S.C. § 106 ...............................................................................................7

17 U.S.C. § 107 .................................................................................... *passim*

Federal Rule 12(b)(6)...............................................................................1

## MEMORANDUM OF POINTS AND AUTHORITIES

### SUMMARY OF ARGUMENT

Plaintiff Tarantino's Complaint as against defendant Gawker should be dismissed pursuant to Federal Rule 12(b)(6) for failure to state a claim upon which relief may be granted.  Tarantino, a well-known moviemaker, announced that he was abandoning a movie project because his draft screenplay had leaked to the public, after being circulated by him.  Following plaintiff's announcement, the news of the leak was widely reported in the media, including by Gawker.  After unknown persons uploaded to third-party websites copies of a document that appeared to be plaintiff's script, Gawker published a follow-up report that included hyperlinks to the webpages where the document appeared.  Plaintiff claims that because Gawker included links with its news report, Gawker "facilitat[ed] and encourag[ed] the public's violation of plaintiff's copyright in the Screenplay," and thus should be liable for contributory copyright infringement.  Compl. ¶ 2.

However, a claim for contributory infringement "does not exist in the absence of direct infringement by a third party."  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 n.13 (9th Cir. 2007) (marks and citation omitted).  Here, the Complaint does no more than raise the possibility that some member of the public who accessed plaintiff's script using Gawker's link subsequently violated Tarantino's rights by committing an infringement.  Because plaintiff did not allege any facts showing that an infringing act actually was undertaken by a third party— merely accessing the script by clicking on the link is legally insufficient—plaintiff did not state a claim for contributory infringement.

Even if plaintiff could state such a claim, Gawker's inclusion of links to source material for its report that the abandoned script had now appeared online is a non-infringing fair use pursuant to 17 U.S.C. § 107.  Application of the fair use factors compels a finding of fair use.  Gawker's challenged use was transformative

and for the statutorily favored purpose of reporting news.  Gawker did not "scoop" plaintiff's right of first publication as the script was online prior to Gawker's links, and Tarantino himself set in motion the circumstances by which the script circulated.  Gawker made minimal use of the script—it reproduced no part of it but merely linked to another publication.  Gawker's use was, at most, incidentally commercial and did not usurp the primary market for and purpose of the script:  to make a movie.  Moreover, the public interest militates for a finding of fair use here. Gawker's links to copies of Tarantino's work already existing online do not credibly diminish plaintiff's incentive to continue to create new works for the lucrative purpose of making movies, but preventing links like Gawker's would negatively affect the public's interest in dissemination of information.

Plaintiff's claim for punitive damages also should be dismissed because such relief is unavailable under the Copyright Act.

## FACTUAL BACKGROUND

As alleged in the Complaint, Tarantino is "a multiple Oscar winning and nominated writer and director."  Compl. ¶ 7.  Tarantino wrote a draft of a screenplay "for a new ensemble western motion picture, titled '*The Hateful Eight*,'" that he was planning to make and "would direct."  *Id*. ¶ 15.  By January 21, 2014, the screenplay draft was leaked and was circulating publicly after plaintiff had circulated copies of it.  *Id*. ¶ 16.  Plaintiff then announced that, as a result of the screenplay having become public, he would not make the movie.  *See* Request for Judicial Notice ("RJN"), Ex. C; Compl. ¶ 16.  As plaintiff indicated in an interview he gave that day (which is referred to in the Complaint), he gave the draft to some actors, they gave it to their agents, and one of them "passed it on to everyone in Hollywood."  RJN, Ex. C.  Plaintiff's interview and, in particular, his announcement that he was dropping the movie was "widely reported in the media."  Compl. ¶ 16.

1    Gawker is a news organization.  *Id.* ¶ 2.  It publishes reports which can be

2    accessed at the Gawker website.  *Id.* ¶ 17.  Like many other media outlets that

3    "widely reported" the story, Gawker reported on the leak of plaintiff's screenplay and

4    his announcement that he would not make the movie.  *Id.* ¶¶ 16, 17; *see also* RJN,

5    Exs. A, B.  On January 22, Gawker published a report entitled "Quentin Tarantino

6    Throws Temper Tantrum After Script Leak."  Compl. ¶ 17.  Gawker reported that,

7    "[a]fter learning Tuesday that his script for *The Hateful Eight* was leaked, Quentin

8    Tarantino . . . decided to cancel the movie" and "[h]e then called Mike Fleming Jr. at

9    Deadline [an Internet publication] so he could make his anger public."  RJN, Ex. B.

10   Around noon on January 23, the website *The Wrap* published an article

11   claiming that it had "obtained a copy of Tarantino's script that's making its way

12   around Hollywood."  *Id.*, Ex. D.  *The Wrap* article disclosed several facts about the

13   script and also reported on a link to the script, noting that "Hollywood assistants are

14   now promulgating a link anyone can use to download a PDF of the script that will no

15   doubt end up online in the coming days."  *Id.*

16   That same day, a complete copy of plaintiff's draft screenplay for *The Hateful*

17   *Eight* was posted by unknown persons on the "file share website AnonFiles.com."

18   Compl. ¶ 18.  Thereafter, unknown persons also posted another copy of the draft to

19   the website Scribd.com.  *Id.* ¶ 33.  "[A]fter the unauthorized infringing copy of the

20   Screenplay was uploaded and posted" to AnonFiles.com, Gawker then published a

21   follow up to its original story, reporting that, since Gawker's first report, "a document

22   that appears to be the script has been made public online."  *Id.* ¶¶ 19, 33; RJN, Ex. A.

23   Gawker did not publish the leaked screenplay on its website.  Its report,

24   entitled "Here Is the Leaked Quentin Tarantino *Hateful Eight* Script," did not include

25   a copy of the script.  RJN, Ex. A.  Rather, the Gawker report included hyperlinks to

26   the pages on AnonFiles.com and Scribd.com where the screenplay already had been

27   published by others.  *See* Comp. ¶¶ 18, 33.  Reporting the development that the

28

-3-

1   script—which Tarantino himself announced had been leaked—had now appeared in
2   full online, Gawker did not invite its readers to copy, distribute or make an infringing
3   use of the script. *See id.* Rather, Gawker merely "encourage[d] Gawker visitors to
4   *read* the Screenplay." *Id.* ¶ 2 (emphasis added).

5        The subject of Gawker's challenged reports clearly was newsworthy as
6   Gawker's reports were "widely commented upon and referred to by various other
7   media outlets." *Id.* ¶ 19.

8        On January 27, 2014, plaintiff brought this Complaint against Gawker solely
9   for contributory infringement. *Id.* ¶¶ 31-41. Plaintiff does not allege that defendant
10  directly infringed plaintiff's copyright; plaintiff alleges that unknown third-parties
11  did. *Id.* ¶¶ 21-30. Instead, Tarantino maintains that defendant is contributorily liable
12  because defendant's reporting on a leak of the script online included links to where
13  the script was posted. *Id.* ¶ 33.[1]

**ARGUMENT**

14  **I.   THE COMPLAINT FAILS TO STATE A CLAIM FOR**
15  **CONTRIBUTORY COPYRIGHT INFRINGEMENT**

16       Merely linking to an allegedly infringing copy, as Gawker is accused of here,
17  does not amount to a primary or direct copyright infringement. *See, e.g., eAdGear,*
18  *Inc. v. Liu*, No. CV-11-05398 JCS, 2012 WL 2367805, at *12 (N.D. Cal. Jun. 21,
19  2012) ("[H]yperlinking alone does not constitute copyright infringement, since it
20  does not involve any actual copying."). Thus, the only claim asserted against Gawker
21  is for contributory infringement. This claim, however, falls short.

22

23  _____
    [1] Plaintiff alleges upon information and belief—without pleading any facts
24  plausibly giving rise to such a belief—that Gawker itself transmitted or
    encouraged posting of his screenplay on AnonFiles.com. Compl. ¶ 18. Plaintiff's
25  surmise is false, and can be addressed at the appropriate juncture should the case
    proceed that far. It is worth noting, however, that if plaintiff truly was informed
26  and believed that Gawker "transmitted" an unauthorized copy of his script to
    AnonFiles.com, plaintiff would presumably have included a direct infringement
27  claim against Gawker—which he did not. Regardless, and insofar as is relevant to
    this Motion, plaintiff has failed to plead any *facts* in support of his belief. *See id.*

28
                                          -4-

To avoid dismissal of a contributory infringement claim, the plaintiff must allege that the defendant "(1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007) (affirming dismissal of plaintiff's contributory infringement claim); *see also Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 995 (9th Cir. 2009); *Goldberg v. Cameron*, 787 F. Supp. 2d 1013, 1018 (N.D. Cal. 2011).

It is fundamental that "'[s]econdary liability for copyright infringement (such as contributory liability) does not exist in the absence of direct infringement by a third party.'" *Perfect 10*, 508 F.3d at 1173 n.13 (citation omitted).  Plaintiff's contribution theory is that Gawker was "facilitating and encouraging *the public's violation* of Plaintiff's copyright in the Screenplay" by providing links to copies that someone else posted to AnonFiles.com and Scribd.com.  Compl. ¶ 2 (emphasis added); *id.* ¶ 19 ("Gawker Media expressly and specifically directed, encouraged and solicited its '*47,000,000 Monthly US Readers*' and *the general public* with click-through URL links on where and how to obtain an unauthorized downloadable copy of the unreleased Screenplay") (emphasis added); *id.* ¶ 33 ("after the unauthorized infringing copy of the Screenplay was uploaded and posted" to AnonFile.com, Gawker, "through its article and specific URL click-through links therein, directed *the general public* on where and how to obtain and download an otherwise unknown unauthorized copy of the unreleased Screenplay.") (emphasis added).  But plaintiff does not identify even a single act of direct infringement committed by any member of the general public to which secondary liability could attach.

Plaintiff merely surmises that some direct infringement took place.  But, a complaint must plead *facts* which would satisfy the elements of a claim.  *See, e.g.*, *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (dismissing contributory infringement claim based on conclusory allegations (quoting

-5-

1   *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1939, 173 L. Ed. 2d. 868

2   (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere

3   conclusory statements, do not suffice.")); *Simonyan v. Ally Fin. Inc.*, No. 12-8495,

4   2013 WL 45453, at *2 (C.D. Cal. Jan. 3, 2013) (Walter, J.) (noting that "factual

5   allegations . . . based on 'information and belief' and contain[ing] nothing more than

6   a rote recitation of the required elements of each respective claim . . . fall well short

7   of the requirements set forth in *Iqbal*"); *Med-Systems, Inc. v. Masterson Mktg., Inc.*,

8   No. 11-cv-695, 2011 WL 5873399, at *7 (S.D. Cal. Nov. 23, 2011) (under *Iqbal* a

9   court need not accept as true plaintiff's conclusory allegations and legal conclusions)

10   (dismissing contributory infringement claim).

11         Plaintiff's conclusory allegation that Gawker "cause[d] the copyrighted work

12   to be copied," Compl. ¶ 35, is devoid of factual support.  The Complaint repeatedly

13   alleges that the copies on the third party sites were "downloadable"—*i.e.*, capable of

14   being downloaded—but nowhere alleges that anyone actually did download a copy as

15   opposed to just viewing the content on their screen.  The Complaint provides no facts

16   showing that anyone actually clicked the links in Gawker's report, let alone engaged

17   in an act of infringement by, for example, making or distributing copies of the script.

18         Indeed, assuming that some Gawker readers did click the links and view the

19   script, plaintiff does not plead that any of them actually saved or otherwise made a

20   copy—as opposed to just "read[ing] the screenplay" as Gawker was "encouraging"

21   them to do.  *Id*. ¶ 2.  But simply viewing a copy of allegedly infringing work on one's

22   own computer *does not* constitute direct infringement.  *See Perfect 10, Inc.*, 508 F.3d

23   at 1169 (where alleged primary infringers merely view pages containing infringing

24   images, but do not "store[] infringing images on their computers," there is no

25   infringement).  As Judge Posner aptly put it in a case involving a website that

26   allowed users to work around a paywall that protected copyrighted material:

27           [A]s long as the visitor makes no copy of the copyrighted video that he

28           is watching, he is not violating the copyright owner's exclusive right,

-6-

conferred by the Copyright Act, "to reproduce the copyrighted work in copies" and "distribute copies . . . of the copyrighted work to the public."  17 U.S.C. § 106(1), (3).  His bypassing Flava's paywall by viewing the uploaded copy is equivalent to stealing a copyrighted book from a bookstore and reading it.  That is a bad thing to do (in either case) but it is not copyright infringement.  The infringer is the customer of Flava who copied Flava's copyrighted video by uploading it to the Internet.

*Flava Works, Inc. v. Gunter*, 689 F.3d 754, 757 (7th Cir. 2012).

Thus, while Tarantino must plead facts alleging direct infringement beyond mere viewing, the Complaint alleges nothing more than sweeping categories of infringing conduct without identifying a single specific instance of infringement, time of infringement, or even the identity of a single third-party infringer.  *See* Compl. ¶¶ 19, 34.  More is required to state a claim for contributory infringement, and the Complaint simply fails to plead those facts.  *See, e.g.*, *Bernstein v. JC Penney, Inc.*, No. 98-2958 R EX, 1998 WL 906644, at *1 (C.D. Cal. Sept. 29, 1998) (dismissing contributory infringement claim predicated upon linking theory where defendant argued that "Internet users viewing of the material at issue is not infringing and thus there was no direct infringement . . . to which [defendant] could contribute"); *Panoramic Stock Images, Ltd. v. Pearson Educ., Inc.*, No. 12 CV 9918, 2013 WL 2357586, at *3 (N.D. Ill. May 29, 2013) (dismissing complaint that failed "to identify any third party or publication that allegedly infringed on its copyrights or any factual basis suggesting that [the defendant] induced or encouraged infringement."); *Berry v. Deutsche Bank Trust Co. Ams.*, No. 07 CIV. 7634 (WHP), 2008 WL 4694968, at *5 (S.D.N.Y. Oct. 21, 2008) (dismissing claim where plaintiff failed to allege *facts* showing that the defendants "acted in concert with any direct infringer or directed the infringement"), *aff'd*, 378 F. App'x 110 (2d Cir. 2010); *Flava Works, Inc. v. Clavio*, No. 11-cv-05100, 2012 WL 2459146, at *3 (N.D. Ill. Jun. 27, 2012) (granting motion to dismiss contributory infringement claim where "complaint does not include a single factual allegation of some third-party—even if that third-party's specific identity is unknown—who was infringing with the assistance and knowledge of"

-7-

1   defendant); *Viesti Assocs., Inc. v. Pearson Educ., Inc.*, No. 12-CV-02240-PAB-DW,

2   2013 WL 4052024, at *7 (D. Colo. Aug. 12, 2013) ("Without factual allegations

3   describing instances of Pearson encouraging or promoting third parties to infringe

4   Viesti's photographs, the complaint does not permit the Court to infer more than the

5   mere possibility of Pearson's misconduct.  However, allegations that are merely

6   consistent with the possibility that Pearson is liable fail to state a plausible claim for

7   relief.") (citing *Iqbal*, 556 U.S. at 678).

8        Plaintiff's claim also fails because he has not adequately alleged that Gawker

9   induced third parties to infringe.  Tarantino's allegation that Gawker "intended to and

10  did directly cause, contribute to, enable, facilitate, aid, abet, induce and/or participate

11  in the dissemination of and infringement of Plaintiff's copyrighted work," Compl. ¶

12  34, has no factual support.  Gawker merely told its readers to "Enjoy!," *id*. ¶ 33, and

13  "encourage[d]" them "to read the Screenplay"—a non-infringing act, *id*. ¶ 2.  This

14  simply does not constitute an inducement to commit an infringing act.  *Cf. Metro-*

15  *Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937-38, 125 S. Ct.

16  2764, 2780, 162 L. Ed. 2d. 781 (2005) (finding secondary liability where companies

17  actively marketed products *for their infringing uses*).

18       Moreover, all of plaintiff's allegations regarding contributory infringement are

19  made "upon information and belief."  Compl. ¶¶ 18-19, 33-34.  Absent factual

20  allegations providing the bases for such beliefs, such allegations are insufficient as a

21  matter of law.  *See, e.g.*, *Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689, 694 (9th

22  Cir. 2009) (finding insufficient allegations based "upon information and belief"

23  where no further facts were alleged); *Muench Photography, Inc. v. Pearson Educ.,*

24  *Inc.*, No. 13–cv–03937, 2013 WL 6172953, at *6 (N.D. Cal. Nov. 25, 2013) (plaintiff

25  cannot plead "on information and belief" without providing fact to support its

26  allegations) (dismissing contributory infringement claim); *Solis v. City of Fresno*, No.

27  11-CV-00053, 2012 WL 868681, at *8 (E.D. Cal. Mar. 13, 2012) ("In the post-

28

-8-

1   *Twombly* and *Iqbal* era, pleading on information and belief, without more, is

2   insufficient to survive a motion to dismiss for failure to state a claim."); *Simonyan*,

3   2013 WL 45453, at *2.  Because plaintiff merely speculates about but does not

4   identify *any* direct infringement to which Gawker contributed, the Complaint does

5   not state a claim for contributory infringement.  *See Salt Optics, Inc. v. Jand, Inc.*,

6   No. 10-0828, 2010 WL 4961702, at *2 (C.D. Cal. Nov. 19, 2010) ("If the facts only

7   allow a court to draw a reasonable inference that the defendant is possibly liable, then

8   the complaint must be dismissed.").

9       In sum, plaintiff's allegations amount to no more than that there is a possibility

10  that someone who accessed the screenplay through Gawker's links committed a

11  direct infringement.  But, plaintiff has not alleged the requisite facts to permit this

12  Court "to infer more than the *mere possibility* of misconduct."  *Iqbal*, 566 U.S. at 679

13  (emphasis added).  Thus, the Complaint does not establish a primary infringement to

14  which secondary liability may attach, and therefore does not state a claim for

15  contributory infringement against Gawker.

16  **II.   GAWKER'S LINKS TO PLAINTIFF'S CONTENT AS PART OF A
17  NEWS REPORT ARE FAIR USE**

18      Even if plaintiff could state a claim for contributory infringement against

19  Gawker, the claim would be subject to dismissal because the challenged report made

20  fair use of plaintiff's work.  Plaintiff attempts to extend a claim for contributory

21  copyright infringement far beyond its outer boundaries.  As a result, plaintiff's

22  Complaint runs headlong into First Amendment protections embodied within the

23  Copyright Act's fair use doctrine.  In short, the circumstances of this case prohibit the

24  imposition of liability as a result of Gawker's fair use of the copyrighted work for the

25  purpose of disseminating news to the public and the public's fair use of the

26  copyrighted work in the context of news consumption.

27

28

-9-

1    Not every unauthorized use of a copyrighted work amounts to infringement.

2  The doctrine of "fair use," codified at 17 U.S.C. § 107, "is a means of balancing the

3  need to provide individuals with sufficient incentives to create public works with the

4  public's interest in the dissemination of information."  *Hustler Magazine, Inc. v.*

5  *Moral Majority, Inc.*, 796 F.2d 1148, 1151 (9th Cir. 1986).  The Copyright Act

6  expressly provides that, notwithstanding other provisions of the statute, "the fair use

7  of a copyrighted work . . . for purposes such as criticism, comment, [or] *news*

8  *reporting*, . . . is not an infringement of copyright."  17 U.S.C. § 107 (emphasis

9  added).  In addition, the statute specifies four factors to take into account to

10  determine whether a particular use is fair:  (i) the purpose of the use; (ii) the nature of

11  the copyrighted work; (iii) the amount and substantiality of the portion used; and (iv)

12  the effect of the use on the market for the original.  *Id.*  These considerations,

13  however, are not exclusive, and courts may consider each case's unique facts in

14  deciding whether a use is fair.  *See, e.g.*, *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d

15  1510, 1522 (9th Cir. 1992).  Fair use is "an equitable rule of reason," *id.*, and should

16  be given a broad compass, *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569,

17  579, 114 S. Ct. 1164, 1171, 127 L. Ed. 2d 500 (1994) (the fair use doctrine is

18  intended to "guarantee . . . breathing space").

19    The fair use doctrine is especially sensitive to uses made in order to inform the

20  public.  *Moral Majority, Inc.*, 796 F.2d at 1151.  Indeed, First Amendment concerns

21  are "allayed" by the fair use doctrine, *see A&M Records, Inc. v. Napster, Inc.*, 239

22  F.3d 1004, 1028 (9th Cir. 2001), precisely because they are incorporated into it, *see*

23  *Moral Majority, Inc.*, 796 F.2d at 1152; *see also Swatch Grp. Mgmt. Servs. Ltd. v.*

24  *Bloomberg L.P.*, No. 12-2412-CV, --- F.3d ---, 2014 WL 274407, at *8 (2d Cir. Jan.

25  27, 2014) (noting in a fair use analysis that "deliver[ing] newsworthy . . . information

26  . . . lies at the core of the First Amendment [and] would be crippled if the news media

27  and similar organizations were limited to authorized sources of information").

28

-10-

GAWKER MEDIA, LLC'S
MOTION TO DISMISS COMPLAINT

1   Although fair use generally is a mixed question of fact and law, "an assertion

2   of fair use 'may be considered on a motion to dismiss, which requires the court to

3   consider all allegations to be true, in a manner substantially similar to consideration

4   of the same issue on a motion for summary judgment, when no material facts are in

5   dispute.'" *Shepard v. Miler*, No. Civ-10-1863, 2010 WL 5205108, at *3 (E.D. Cal.

6   Dec. 15, 2010) (quoting *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530

7   (9th Cir. 2008)); *see also, e.g.*, *Sedgwick Claims Mgmt. Servs., Inc. v. Delsman*, No.

8   C 09–1468 SBA, 2009 WL 2157573, at *7 (N.D. Cal. 2009) ("the Court finds that

9   Defendant's use of the photographs in both their unaltered and altered format was a

10   fair use within the meaning of the Copyright Act and GRANTS Defendant's motion

11   to dismiss"), *aff'd*, 422 F. App'x 651 (9th Cir. 2011); *Burnett v. Twentieth Century*

12   *Fox Film Corp.*, 491 F. Supp. 2d 962, 972 (C.D. Cal. 2007) (granting defendant's

13   motion to dismiss on fair use grounds).

14   When applying the doctrine of fair use to contributory infringement claims, the

15   Ninth Circuit initially approved of focusing on the use made by the primary

16   infringers, *see Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc*., 964 F.2d 965, 970

17   (9th Cir. 1992), but later dismissed this approach as "clearly dicta," *see Micro Star v.*

18   *Formgen Inc.*, 154 F.3d 1107, 1113 (9th Cir. 1998).  Where the alleged contributory

19   infringement is itself speech related, focusing on the use made by the alleged

20   contributory infringer is appropriate.  *See, e.g.*, *Sega Enters. Ltd. v. MAPHIA*, 948 F.

21   Supp. 923, 934 (N.D. Cal. 1996) (finding that a bulletin board operator "may . . .

22   avoid liability if his contributing actions qualify as fair use"); *Online Policy Grp. v.*

23   *Diebold, Inc*., 337 F. Supp. 2d 1195, 1198, 1203 (N.D. Cal. 2004) (finding that, when

24   "on-line newspaper, IndyMedia, published an article criticizing Diebold's electronic

25   voting machines and containing a hyperlink to the [allegedly infringing] email

26   archive," the "use was transformative"); *cf. Religious Tech. Ctr. v. Netcom On-Line*

27   *Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1378 (N.D. Cal. 1995) (applying fair use to

28

-11-

1  contributory infringement claim; "[t]he proper focus here is on whether Netcom's
2  [the alleged contributory infringer] actions qualify as fair use, not on whether Erlich
3  [the direct infringer] himself engaged in fair use.").

4      Here, whether focusing on Gawker or the alleged primary infringers, the facts
5  alleged in the Complaint demonstrate that Gawker's link to an item in the news while
6  reporting on that item was a non-infringing fair use as a matter of law.

7  **A.  <u>The purpose and character of Gawker's use favors a finding of fair use.</u>**

8      The analysis of the first factor, "the purpose and character of the use," 17
9  U.S.C. § 107(1), is guided by "the examples given in the preamble to § 107, looking
10  to whether the use is for criticism, or comment, or *news reporting*, and the like."
11  *Campbell*, 510 U.S. at 578-79 (emphasis added).  Indeed, some courts have held that
12  "there is a strong presumption that factor one favors the defendant if the allegedly
13  infringing work fits the description of uses described in section 107." *Wright v.*
14  *Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991); *see also, e.g.*, *NXIVM Corp. v.*
15  *Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) (same).  There is no doubt that, as an
16  included exemplar of fair use, news reporting has "a favored purpose under the
17  statute." *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 940, *as*
18  *amended*, 313 F.3d 1093 (9th Cir. 2002).

19      **1.  Gawker's Use Was For the Purpose of News Reporting**

20      Tarantino's Complaint makes clear that Gawker's links to the script were done
21  in the context of news reporting.  Although denigrating the style of Gawker's
22  reporting as "predatory," the Complaint concedes that Gawker is engaged in the
23  "business of . . . journalism."  Compl. ¶ 2.  As the Complaint recounts, Tarantino,
24  who "is a multiple Oscar winning and nominated writer and director," *id*. ¶ 7,
25  publicly announced that he "decided to postpone" working on his movie because his
26  screenplay had "been leaked publicly," *id*. ¶ 16.  This news about the screenplay
27  leaking "was widely reported in the media"—including by Gawker.  *Id*. ¶¶ 16-17.  On

28

January 22, Gawker published a report about the leaked script, entitled "Quentin Tarantino Throws Temper Tantrum After Script Leak." *Id*. ¶ 17.  The following day, a copy of the screenplay that was the subject of Gawker's and others' news reports appeared online at AnonFiles.com. *Id*. ¶¶ 18-19.  Gawker then published a follow-up report, reiterating that: "An angry and 'betrayed' Quentin Tarantino decided to abandon his latest film, *The Hateful Eight*, after a script leak earlier this week," and reporting that "a document that appears to be the script has been made public online." *Id*. ¶ 19; *see also* RJN, Ex. A.  Although titled "Here Is the Leaked Quentin Tarantino *Hateful Eight* Script," Gawker's report did not actually include a copy of the script, but contained hyperlinks to third-party webpages on which the script could be read.[2] RJN, Ex. A.  It cannot reasonably be disputed that Gawker's linking to webpages featuring the script was done as part of its reporting about the script becoming available—the leaking of the script and its appearance online *was* the news.  As plaintiff said, Gawker's report and the news about the script being available was "widely commented upon and referred to by various other media outlets."  Compl. ¶ 19.[3]

---

[2] According to plaintiff, on January 26, Gawker allegedly amended its January 23 report to include news that the script had also been made public at the website Scribd.com and included a link thereto.  Compl. ¶ 33.

[3] Plaintiff is not helped by his conclusory assertion that there "was nothing newsworthy or journalistic about Gawker Media facilitating and encouraging the public's violation of Plaintiff's copyright." *Id*. ¶ 2.  This statement not only mischaracterizes Gawker's reporting, but is contradicted by the facts in plaintiff's own Complaint.  The script and the leak of the script had become the subject of extensive news coverage after plaintiff gave an interview to the media about the leak. *See* RJN, Exs. C, D; *see also* Compl. ¶ 16.  Plaintiff himself sought out media coverage of the leak.  Compl. ¶ 16.  As the Complaint indicates, news reports about the leak were prompted by plaintiff's own interview, which was "widely reported in the media." *Id*.  Once the script was leaked online, part of the news about the very story put in motion by plaintiff became the links themselves. In short, the newsworthiness of information about the leaked script can hardly be contested where plaintiff himself ignited media coverage *over the exact same controversy*. *Id*.

-13-

### 2. Gawker's Use Was Transformative

Although "transformative use is not 'absolutely necessary'" for a finding of fair use, transformative works advance the goals of copyright law, and thus they are at the "heart of the fair use doctrine's breathing space within the confines of copyright." *Northland Family Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform*, 868 F. Supp. 2d 962, 970 (C.D. Cal. 2012) (quoting *Campbell*, 510 U.S. at 579). Here, Gawker's use of the script in connection with its report about the script was transformative.

"A work is 'transformative' when the new work does not 'merely supersede the objects of the original creation' but rather 'adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'" *Perfect 10*, 508 F.3d at 1164 (citing *Campbell*, 510 U.S. at 579). Here, as the Complaint makes clear, the purpose of the original work—plaintiff's screenplay—was to make "a new ensemble western motion picture, titled *The Hateful Eight*," which plaintiff "would direct." Compl. ¶ 15. Gawker, of course, did not use the script to make a movie but linked to it for the entirely different purpose of reporting the news that the script had been leaked online and that plaintiff announced he would not make the movie. *Online Policy Grp.*, 337 F. Supp. 2d at 1203 (publisher's inclusion of link to infringing archive "was transformative: they used the email archive to support criticism that is in the public interest, not to develop [competing] electronic voting technology."). Courts routinely find such reporting to be transformative.

For example, in *Calkins v. Playboy Enterprises International, Inc*., 561 F. Supp. 2d 1136, 1141 (E.D. Cal. 2008), the court found a magazine's unauthorized publication of a high school photo created by the plaintiff to be transformative because the magazine's use "served an entirely different function than the original image." The court concluded that because [the publisher] used the Photograph in a

-14-

new context to serve a different function (inform and entertain Playboy readers) than the original function (gifts for family and friends), PEI's use did not supersede the function of the original Photograph, and therefore PEI's use is transformative." *Id.*; *see also, e.g.*, *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22-23 (1st Cir. 2000) (republication of photographs taken for a modeling portfolio in a newspaper was transformative because the photos served to inform, as well as entertain). Indeed, "the Ninth Circuit has consistently held that 'making an exact copy of a work may be transformative so long as the copy serves a different function than the original work.'" *Sedgwick Claims Mgmt. Servs.*, 2009 WL 2157573, at *5 (citing *Perfect 10*, 508 F.3d at 1164); *see also, e.g.*, *Perfect 10*, 508 F.3d at 1164 ("a search engine puts images 'in a different context' so that they are 'transformed into a new creation.'"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 816 (9th Cir. 2003) ("exact replication" of protected images was fair use where used in a different context from the original); *Stern v. Does*, No. CV 09-01986, 2011 WL 997230, at *9 (C.D. Cal. Feb. 10, 2011) ("By forwarding the post in e-mails, they conveyed the fact of the post rather than its underlying message.  Defendants' e-mails thus had a substantially different purpose than the post itself, a fact which weighs heavily in favor of fair use."), *aff'd*, *Stern v. Weinstein*, 512 F. App'x 701 (9th Cir. 2013).

     Gawker's use was transformative not only because it was for a different purpose than the original, but because Gawker built upon the original by adding "something new." *Campbell*, 510 U.S. at 579.  Indeed, Gawker's report did not even include a copy of the original—only a link—so everything that appeared in Gawker's report was new and not part of the original.  Gawker's reporting presented the screenplay in the context of reporting the news of its leak and Tarantino's reaction to the leak.  None of that is present in the original.

### 3.    Gawker's Use Was at Most Incidentally Commercial

When analyzing the first fair use factor, courts should take into account whether the "use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).  But, even uses that are commercial are not presumptively unfair. *See Campbell*, 510 U.S. at 584 (rejecting the proposition that all commercial uses are presumptively unfair because it would "swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107").  And, where the use is transformative—such as was Gawker's use—"the less the significance of other factors that weigh against fair use, such as use of a commercial nature." *Calkins*, 561 F. Supp. 2d at 1141 (citing *Campbell*, 510 U.S. at 579); *see also, e.g.*, *SOFA Entm't., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278-79 (9th Cir. 2013) ("[B]ecause Dodger's use of the clip is transformative, the fact that *Jersey Boys* is a commercial production is of little significance.").  In short, because "[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit," commerciality does not carry much weight where "the link between [the defendant]'s commercial gain and its copying is . . . attenuated" or the commercial aspect is incidental. *Swatch Grp.*, 2014 WL 274407, at *7 (marks and citations omitted); *see also, e.g.*, *Kelly*, 336 F.3d at 818 ("commercial" nature given little weight where use is "more incidental and less exploitative in nature than more traditional types of commercial uses," such as using the work "to directly promote its web site [or] trying to profit by selling [the] images."); *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 627 (9th Cir. 2003) (To be considered "commercial" use, the use must "exploit[ ] the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise."), *overruled on other grounds*, *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011).

For example, in *Calkins*, the court found that "the first fair use factor weighs heavily in favor of a fair use determination" notwithstanding that the copyrighted

-16-

work "was used for a commercial purpose inasmuch as PEI is a for-profit enterprise and the Photograph appeared in Playboy." 561 F. Supp. 2d at 1141-42. Thus, although it was in some general sense "commercial," the use "was incidental and less exploitative in nature than more traditional types of commercial use insofar as PEI was neither using the Photograph to directly promote sales of Playboy, nor trying to profit by selling the Photograph." *Id*. at 1141.

Here, Gawker did not compete with Tarantino by making a movie based on the screenplay; it did not sell the script; and it did not feature the script in advertisements for Gawker's website. Gawker merely "encourage[d] Gawker visitors to read the Screenplay." Compl. ¶ 2. Indeed, the Complaint makes no allegation that Gawker profited whatsoever from the screenplay. Any commercial purpose here was incidental to Gawker's link to the screenplay for the proper purpose of news reporting and is of little weight.

### 4.   Gawker's Readers' Use Was For a Proper Purpose

To the extent that the Court focuses on whether the use made by the alleged primary infringer was fair, rather than on Gawker's own conduct, the result is the same. As discussed above, plaintiff accuses Gawker of "encouraging the public's violation of Plaintiff's copyright in the Screenplay." *Id*. But any use by the public identified in the Complaint was for a proper purpose.

Gawker's readers had access to the script to supplement their news consumption. This use is a transformative, non-commercial use, and, therefore, weighs in favor of finding a fair use. *See, e.g.*, *Fox Broad. Co., Inc. v. Dish Network L.L.C.*, No. 12-57048, --- F.3d ---, 2014 WL 260572, at *6 (9th Cir. July. 24, 2013) (home viewing of copyrighted television programming was a "noncommercial, nonprofit activity") (citation omitted). Plaintiff makes no non-conclusory allegation that Gawker's readers produced derivatives of the script, sold it, or profited off the script in any way whatsoever—or that they did anything other than what Gawker

-17-

1  suggested they do: read it.  *See generally* Compl.  Rather, the pleaded facts indicate

2  no more than that Gawker's readers, to the extent that they followed the hyperlinks to

3  the script at all, simply viewed the script as part of their normal news consumption.

4      As the Ninth Circuit made clear in rejecting a claim for contributory

5  infringement based on users viewing Internet content they accessed via a hyperlink:

> The district court reasoned that "[l]ocal caching by the browsers of
> individual users is noncommercial, transformative, and no more than
> necessary to achieve the objectives of decreasing network latency and
> minimizing unnecessary bandwidth usage (essential to the [I]nternet).
> It has a minimal impact on the potential market for the original work . .
> . ."  We agree; even assuming such automatic copying could constitute
> direct infringement, it is a fair use in this context.   The copying
> function performed automatically by a user's computer to assist in
> accessing the Internet is a transformative use.

11  *Perfect 10*, 508 F.3d at 1169 (internal citation omitted).

12     Both Gawker's and its readers' uses in this case were transformative and either

13  non-commercial or only incidentally so.  As such, the first factor weighs heavily in

14  favor of fair use.

15  **B.  The nature of the copyrighted work weighs slightly in favor of fair use or
16  is neutral.**

17     The second factor considers the nature of the copyrighted work.  The Ninth

18  Circuit has recognized, however, that "this factor typically has not been terribly

19  significant in the overall fair use balancing" where a use is transformative.  *Dr. Seuss*

20  *Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997); *see*

21  *also Calkins*, 561 F. Supp. 2d at 1142.

22     Ordinarily, a use of a published work is "more likely to qualify as fair use

23  because the first appearance of the artist's expression has already occurred."  *Kelly*,

24  336 F.3d at 820.  But, "[t]he fact that a work is unpublished shall not itself bar a

25  finding of fair use."  17 U.S.C. § 107(4); *see also Religious Tech. Ctr. v. Netcom On-*

26  *Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1245 (N.D. Cal. 1995) (noting that

27  "the unpublished nature of a work should not itself bar a finding of fair use" (citing

28

-18-

1   H.R. Rep. No. 102–286, 102d Cong., 2d Sess. 8 (1992)).  Moreover, where works

2   have already been distributed publicly—in an authorized or unauthorized manner—

3   the unpublished nature of the works becomes less critical to a fair use analysis.  *See,*

4   *e.g.*, *Nunez*, 235 F.3d at 24.

5          Because the script was already "publicly" available online by the time Gawker

6   linked to it, *see* Compl. ¶¶ 16, 18, Gawker's linking to the script and its readers'

7   viewing the script did not "scoop" plaintiff's right to first publication.  *See Harper &*

8   *Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 542, 105 S. Ct. 2218, 2221, 85

9   L. Ed. 2d 558 (1985).  Indeed, unlike the photographs in *Monge v. Maya Magazines,*

10  *Inc.*, which had "never before [been] seen," 688 F.3d 1164, 1178 (9th Cir. 2012), the

11  script, as plaintiff concedes, was already publicly available at the time Gawker

12  published the contested news article, *see* Compl. ¶¶ 16, 18; *see also* RJN, Ex. C

13  (quoting plaintiff as saying that "everyone in Hollywood" had the script).

14         This case is more analogous to *Nunez v. Caribbean International News Corp.*

15  *See* 235 F.3d at 24.  There, a photographer argued that his right to first publication

16  was violated because a newspaper published photographs of Miss Puerto Rico

17  Universe, which had themselves become the subject of news.  *Id.*  The First Circuit

18  disagreed.  *Id*.  Although the photographs "had not before been published in a book

19  or public portfolio," by the time they were printed in the newspaper, they had been

20  distributed publicly by third parties.  *Id*.  Moreover, the photographer had not

21  registered a copyright prior to publication in the newspaper, taken proactive measures

22  to prevent public disclosure, or "even sought oral promises from recipients not to re-

23  distribute the photographs."  *Id*.

24         Here, as in *Nunez*, plaintiff did not apply for a copyright before the script had

25  been leaked, *compare* Compl. ¶ 15 *with id.* ¶ 16, and there is no allegation in the

26  Complaint that plaintiff attempted to impose any restrictions on the persons to whom

27  he provided the script.  Thus, an agent to whom plaintiff gave the script "passed it on

28

-19-

to everyone in Hollywood." *See* RJN, Ex. C.  The second factor does not weigh against Gawker's linking to a copy that became publicly available through a chain of events set in motion by plaintiff. *See Swatch Grp.*, 2014 WL 274407, at *12 ("If the author does not seek confidentiality, fair use is not necessarily precluded even as to an unpublished work." (quoting 4 Nimmer on Copyright § 13.05[A][2][b][ii])); *see also id.* at *11 (finding the second factor weighed *in favor* of fair use "even though the sound recording remains statutorily *unpublished*, it is clear that Swatch was not deprived of the ability to 'control the first public appearance of [its] expression,' including 'when, where, and in what form' it appeared") (emphasis added).

Although the copyrighted work here is creative, "the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." *Blanch v. Koons*, 467 F.3d 244, 257 (2d Cir. 2006) (marks and citation omitted).  Because Gawker's news report is transformative, the creative nature of plaintiff's screenplay adds little to the analysis.  On balance, the second factor weighs slightly in favor of fair use or is neutral.

**C.  The amount and substantiality of the portion used weighs in favor of a finding of fair use.**

The third factor "asks whether 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole' are reasonable in relation to the copying's purpose." *Campbell*, 510 U.S. at 570.  Said differently, "the extent of permissible copying varies with the purpose and character of the use." *Kelly*, 336 F.3d at 820.

Here, Gawker did not actually "use" the script as contemplated by the Copyright Act—*i.e.*, it did not reproduce, distribute, display, perform or make derivatives of the script but just linked to it.  *See, e.g.*, *eAdGear*, 2012 WL 2367805, at *12 ("[H]yperlinking alone does not constitute copyright infringement, since it does not involve any actual copying.").  The Gawker report contained none of

-20-

plaintiff's work, but simply informed visitors to its site where they could find copies of plaintiff's work that already had been published by someone else.  And, "unless those visitors copy the [content] on the infringers' websites" as opposed to just viewing it there—and there are no factual allegations in the Complaint that they did—Gawker "isn't increasing the amount of infringement."  *Flava Works*, 689 F.3d at 757-58.  Thus, although the entirety of plaintiff's work may have appeared on the sites to which Gawker linked, Gawker itself made minimal use of that work, and no more than was needed for its proper purpose.

The news that Gawker was reporting is that the entire script had become available online.  Gawker's readers did not have to take Gawker's word for it— Gawker was entitled to demonstrate the point by simply linking to the postings so the readers could see for themselves.  *See, e.g.*, *Monge*, 688 F.3d at 1179 (discussing use of a copyrighted work for the purposes of corroboration).  Gawker could not create half of a hyperlink to avoid using more than necessary.  *Religious Tech. Ctr.*, 907 F. Supp. at 1379-80 (use of entire works by Netcom "should not defeat an otherwise valid [fair use] defense" where "Netcom . . . made available to the Usenet exactly what was posted by Erlich.").  Thus, Gawker linked only to "as much as [was] necessary" in order to report the news.  Accordingly, this factor weighs in favor of a finding of fair use.  *See, e.g.*, *Burnett*, 491 F. Supp. 2d at 970-971 (finding on a motion to dismiss that a use was fair where defendant took "just enough" to fulfill its purpose).

In any event, even if Gawker could be deemed to have used the entirety of Tarantino's work, this factor still would not weigh against fair use.  "As the [Supreme Court] found in *Sony* [*Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984)], the mere fact that all of a work is copied is not determinative of the fair use question."  *Religious Tech. Ctr.*, 907 F. Supp. at 1380. Courts routinely find fair use notwithstanding use of entire works.  *See, e.g.*, *Kelly*,

-21-

1    336 F.3d at 821 ("[A]lthough Arriba did copy each of Kelly's images as a whole, it

2    was reasonable to do so in light of Arriba's use of the images."); *Swatch Grp.*, 2014

3    WL 274407, at *13 (finding reproduction of entire two-hour audio recording as part

4    of news report a fair use because "such copying does not necessarily weigh against

5    fair use because copying the entirety of a work is sometimes necessary to make a fair

6    use.") (citation omitted); *Calkins*, 561 F. Supp. 2d at 1143 ("[A]lthough PEI copied

7    the entire Photograph, it was reasonable to do so in light of PEI's purpose for using

8    the Photograph.").  Gawker merely indicated to readers where they could access what

9    already was online.

10   **D.  The effect of the use upon the potential market weighs in favor of a finding**

11       **of fair use.**

12        The fourth factor requires courts to consider "the effect of the use upon the

13   potential market for or value of the copyrighted work."  *See* 17 U.S.C. § 107(4).  The

14   market must be "traditional, reasonable, or likely to be developed."  *Seltzer v. Green*

15   *Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013) (citation omitted).  This factor calls

16   "for the striking of a balance 'between the benefit the public will derive if the use is

17   permitted and the personal gain the copyright owner will receive if the use is

18   denied.'"  *Penguin Books USA, Inc.*, 109 F.3d at 1403 (quoting *MCA, Inc. v. Wilson*,

19   677 F.2d 180, 183 (2d Cir. 1981)).  Generally, courts should not presume harm in the

20   potential market.  *Monge*, 688 F.3d at 1181.  Indeed, "'[t]he existence of [a] potential

21   market cannot be presumed'" either.  *Mattel Inc. v. Walking Mountain Prods.*, 353

22   F.3d 792, 805 (9th Cir. 2003) (citation omitted).  And, "the importance of this factor

23   will vary, not only with the amount of harm, but also with the relative strength of the

24   showing on the other factors."  *Campbell*, 510 U.S. at 591 n.21.

25        The value of plaintiff's screenplay is derived from its possible use in the

26   making of "a new ensemble western motion picture," and its market is among

27   potential producers of such a movie.  Compl. ¶ 15.  Gawker's linking to the

28                                          -22-

1   screenplay and/or its readers viewing it gives rise to no plausible harm to that

2   market.[4]  According to Tarantino, his scripts frequently get leaked online, and he

3   "like[s] the fact that everyone eventually posts [my script], gets it and reviews it on

4   the net.  Frankly, I wouldn't want it any other way.  I like the fact that people like my

5   shit, and that they go out of their way to find it and read it."  RJN, Ex. C.

6       Thus, the Complaint does not allege that any production company whatsoever

7   was less likely to want to acquire the screenplay as a result of Gawker's links.

8   Gawker's news report simply "did not perform the same 'market function' as the

9   original."  *Seltzer*, 725 F.3d at 1179.  Accordingly, "there is no reasonable argument

10  that conduct of the sort engaged in" by Gawker "is a substitute for the primary

11  market" for plaintiff's screenplay.  *Id.*; *see also, e.g.*, *CBS Broad., Inc.*, 305 F.3d at

12  942 (noting that fourth factor weighed in favor of defendant even where defendant

13  was a broadcaster and plaintiff licensed video broadcasters because defendant was

14  not competing with plaintiff).

15  **E.  The balance of the factors, taken together with the public interest,**
16      **demonstrates that fair use was made.**

17      Gawker's link to plaintiff's screenplay was for the statutorily favored purpose

18  of news reporting.  This use was transformative and did not supplant the market for

19  plaintiff's work.  Gawker's linking to other websites, rather than itself reproducing

20  the actual script in whole or part, made minimal if any use of the original work.

21  Balancing the statutory factors compels a finding of fair use.  Such a finding

22  comports with the public interest.

23  _____

24      [4] Such leaks happen regularly in this extremely profitable industry.  *See,
    e.g.*, *'X-Men Days of Future Past' Revealed: LEAKED Script Sheds New Light On
25  Hotly-Anticipated Blockbuster – PLUS Find Out Who Dies!*, Radar Online (Jan.
    15, 2014), http://radaronline.com/exclusives/2014/01/x-men-days-future-past-
26  script-leaked/; Zachary Stieber, *Godzilla 2014 Script Leaked? Possible Spoilers
    (+Teaser Trailed)*, Epoch Times (Jan. 17, 2014),
27  http://www.theepochtimes.com/n3/455758-godzilla-2014-script-leaked-possible-
    spoilers-teaser-trailer/.

28

1    "The purpose of copyright is to create incentives for creative effort."  *Sony*

2    *Corp. of Am.*, 464 U.S. at 450.  "The sole interest of the United States and the

3    primary object in conferring the [copyright] monopoly . . . lie in the general benefits

4    derived by the public from the benefit of authors."  *Twentieth Century Music Corp. v.*

5    *Aiken*, 422 U.S. 151, 156, 95 S. Ct. 2040, 2044, 45 L. Ed. 2d 84 (1975) (citation

6    omitted).  And, "[f]air use reflects the goals of the Copyright Act 'to promote the

7    progress of science and art by protecting artistic and scientific works while

8    encouraging the development and evolution of new works.'"  *Northland*, 868 F.

9    Supp. 2d at 969-70 (quoting *Mattel Inc.*, 353 F.3d at 799); *see also, e.g.*, *Swatch*

10   *Grp.*, 2014 WL 274407, at *5.  "The ultimate test of fair use . . . is whether the

11   copyright law's goal of promoting the Progress of Science and useful Arts . . . would

12   be better served by allowing the use than by preventing it."  *Cariou v. Prince*, 714

13   F.3d 694, 705 (2d Cir.), *cert. denied*, 134 S. Ct. 618, 187 L. Ed. 2d. 411 (2013)

14   (marks and citation omitted).  Where a use does not diminish the incentive for

15   creation of a work, of course, the use "need not be prohibited in order to protect the

16   author's incentive to create"—otherwise the prohibition "would merely inhibit access

17   to ideas without any countervailing benefit."  *Sony Corp. of Am.*, 464 U.S. at 450-51.

18   Tarantino is a moviemaker.  He writes screenplays to make movies.  Gawker,

19   in contrast, conveys news and information to the public.  Given the value of

20   plaintiff's work for the purpose of developing major motion pictures, he already has

21   great incentive to continue creating new works.  Gawker's links to an already extant

22   copy of a screenplay hardly diminishes that incentive.  The links thus do "not stifle

23   artistic creativity" but instead "benefit the public by enhancing information-gathering

24   techniques on the [I]nternet."  *Kelly*, 336 F.3d at 820.  Preventing the links would

25   shortchange "the public's interest in the dissemination of information," *Moral*

26   *Majority Inc.*, 796 F.2d at 1151, without any countervailing benefit.  The public

27   interests protected by copyright are best served by finding fair use here.

28
                                          -24-

### III.  PLAINTIFF'S PRAYER FOR RELIEF REGARDING PUNITIVE DAMAGES SHOULD BE DISMISSED

Plaintiff asks that this Court award him "punitive and exemplary damages" for Gawker's alleged contributory infringement.  *See* Compl., Prayer for Relief ¶¶ 3, 8. This prayer for relief should be dismissed for the simple reason that punitive damages are not available under the Copyright Act.  *See Krisel v. Contempo Homes, Inc.*, No. 0600507, 2006 WL 5668181, at *3  (C.D. Cal. Sept. 27, 2006) (citing *Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir. 1983)); *see also Saregama India Ltd. v. Young*, No. CV 02 9856 RJK, 2003 WL 25769784, at *1 (C.D. Cal. Mar. 11, 2003) (same) (listing cases).  Therefore, defendant respectfully requests that the court dismiss this prayer for relief.  *See Reinicke v. Creative Empire, LLC*, No. 12-cv-1405, 2013 WL 275900, at *5 (S.D. Cal. Jan. 24, 2013) (granting motion to dismiss prayer for relief in a copyright action because "[p]unitive damages are not available under the Copyright Act").

### CONCLUSION

Because there was no primary infringement to which Gawker's links contributed, plaintiff has failed to state a claim for contributory copyright infringement.  Even if plaintiff had been able to establish the elements of such a claim, Gawker's use of links to materials already posted to the Internet by third parties was privileged as a fair use.  Gawker therefore respectfully requests this Court to grant its motion to dismiss the Complaint, enter judgment in its favor and against plaintiff, and award to Gawker Media, LLC its costs and attorneys' fees.

DATED:  March 10, 2014        LEVINE SULLIVAN KOCH & SCHULZ, LLP
                              ROBERT PENCHINA *
                              THOMAS CURLEY *

                              JASSY VICK CAROLAN LLP
                              KEVIN L. VICK
                              JEAN-PAUL JASSY


                              By:   /s/      Robert Penchina

                              ROBERT PENCHINA

                              Attorneys for Defendant
                              GAWKER MEDIA, LLC

                              * admitted *Pro Hac Vice*

-26-