**MARTIN D. SINGER (BAR NO. 78166)**
**EVAN N. SPIEGEL (BAR NO. 198071)**
**HENRY L. SELF III (BAR NO. 223153)**
**LAVELY & SINGER**
**PROFESSIONAL CORPORATION**
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone:  (310) 556-3501
Facsimile: (310) 556-3615
E-Mail: mdsinger@lavelysinger.com
        espiegel@lavelysinger.com

Attorneys for Plaintiff
**QUENTIN TARANTINO**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUENTIN TARANTINO, an individual, <br><br> Plaintiff, <br><br> v. <br><br> GAWKER MEDIA, LLC, a/k/a Gawker Media, a Delaware corporation; GAWKER MEDIA GROUP, INC, a/k/a Gawker Media, a Cayman Islands corporation; GAWKER ENTERTAINMENT, LLC, a/k/a Gawker Media, a New York corporation; DOE-1, a/k/a ANONFILES.com, an unknown entity/person, and DOES 2 through 10, inclusive, <br><br> Defendants. | CASE NO. 14-CV-603-JFW (FFMx) <br><br> [Hon. John F. Walter] <br><br> **OPPOSITION TO DEFENDANT GAWKER MEDIA, LLC'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO F.R.C.P. 12(b)(6)** <br><br> Date:     April 14, 2014 <br> Time:     1:30 p.m. <br> Ctrm:    16 <br><br> [Filed Concurrently With: (i) Appendix of Unpublished Authorities; and (ii) Opposition to Request for Judicial Notice] |

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   MEMORANDUM OF POINTS & AUTHORITIES . . . . . . . . . . . . . . . . . 5

      A.   Motions to Dismiss Under Rule 12(b)(6) Are Disfavored . . . . . . . . 5

      B.   The Complaint States a Valid Claim Against Gawker for
           Contributory Copyright Infringement . . . . . . . . . . . . . . . . . . . . . . . 5

           1.   The Complaint States Valid Claims for Underlying Direct
                Copyright Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                a.   Tarantino Authored and Owns the Screenplay . . . . . . . . 6

                b.   The First Claim for Relief Alleges Direct
                     Infringement By the Doe Defendants . . . . . . . . . . . . . . 6

                c.   The Complaint Also Alleges Direct Infringement By
                     Internet Users Via Gawker's Links. . . . . . . . . . . . . . . . 8

           2.   Gawker Had Knowledge of the Infringing Activity . . . . . . . . 9

           3.   Gawker Induced, Caused and/or Materially
                Contributed to the Infringing Conduct . . . . . . . . . . . . . . . . . 10

      C.   It is Inappropriate to Analyze Gawker's Fair Use Defense Now . . . 12

      D.   The Fair Use Doctrine Does Not Absolve Gawker of Liability . . . . 13

           1.   The Primary Infringers' Use of the Screenplay
                Was Not Fair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                a.   The Purpose and Character of Use Weigh
                     Against a Finding of Fair Use . . . . . . . . . . . . . . . . . . . 15

                     (1)   The Use Was Not Transformative . . . . . . . . . . 15

                     (2)   The Use Was Commercial . . . . . . . . . . . . . . . 15

                b.   The Nature of the Copyrighted Work Weighs
                     Against a Finding of Fair Use . . . . . . . . . . . . . . . . . . . 16

                     (1)   The Screenplay Is Unpublished . . . . . . . . . . . 16

                     (2)   The Screenplay Is a Creative Work . . . . . . . . . 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS (CONTINUED)

Page No.

c.    The Amount and Substantiality of the Portion Used
      Weighs Against a Finding of Fair Use . . . . . . . . . . . . 18

d.    The Effect of Use Upon the Potential Market
      Weighs Against a Finding of Fair Use . . . . . . . . . . . . 19

2.   Gawker's Purported "Use" of the Screenplay Was Not Fair . . 21

a.    The Purpose and Character of Use Weigh
      Against a Finding of Fair Use . . . . . . . . . . . . . . . . . . . . 21

      (1)   The Use Was Not Truly for News Reporting . . . 21

      (2)   The Use Was Not Transformative . . . . . . . . . . 22

      (3)   The Use Was Commercial . . . . . . . . . . . . . . 23

b.    The Nature of the Copyrighted Work Weighs
      Against a Finding of Fair Use . . . . . . . . . . . . . . . . . . . . 23

c.    The Amount and Substantiality of the Portion Used
      Weighs Against a Finding of Fair Use . . . . . . . . . . . . 23

d.    The Effect of Use Upon the Potential Market
      Weighs Against a Finding of Fair Use . . . . . . . . . . . . 24

E.   Motion to Dismiss Punitive Damages Should Not to be Granted ... 25

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page No.

*Araya v. Deep Dive Media, LLC and Gawker Media, LLC*
  5:12-CV-163, 2013 WL 4494881 (W.D.N.C. Aug. 20, 2013) . . . . 17, 18, 19

*Arista Records, Inc. v. MP3Board, Inc.,*
  No. 00 Civ. 4660, 2002 WL 1997918 (S.D.N.Y. Aug. 28, 2002) . . . . . . . 10

*A&M Records, Inc. v. Napster, Inc.,*
  239 F.3d 1004 (9th Cir. 2001). . . . . . . . . . . . 5, 6, 9, 10, 14, 16, 20, 22, 25

*Broam v. Bogan*, 320 F.3d 1023 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . 5

*Browne v. McCain,*
  612 F.Supp.2d 1125 (C.D. Cal. 2009) . . . . . . . . . . . . . . . . . . 8, 12, 13, 20

*Brownmark Films, LLC v. Comedy Partners,*
  682 F.3d 687 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569, 114 S. Ct. 1164 (1994) . . . . . . . . . . . . . . . 15, 18, 19, 20, 23

*Columbia Pictures Industries, Inc. v. Fung,*
  710 F.3d 1020 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 21

*Columbia Pictures v. Krypton Broadcasting,*
  259 F.3d 1186 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Disney Enterprises, Inc. v. Hotfile Corp.,*
  798 F.Supp.2d 1303 (S.D. Fla. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

*Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc.,*
  109 F.3d 1394 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Ellison v. Robertson,*
  357 F.3d 1072 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,*
  499 U.S. 340, 111 S.Ct. 1282 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Four Navy Seals v. Associated Press,*
  413 F.Supp.2d 1136 (S.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . 5, 12

*Harper & Row v. Nation Enter.,*
  471 U.S. 539, 105 S. Ct. 2218 n.3 (1985) . . . . . . . 13, 16, 17, 19, 21, 23, 24

*Infinity Broadcast Corp. v. Kirkwood,*
  150 F.3d 104 (2d Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Intellectual Reserve v. Utah Lighthouse Ministry,*
  75 F.Supp.2d 1290 (D. Utah 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

*(Continued On Next Page)*

**FEDERAL CASES (CONTINUED)** Page No.

*Leadsinger, Inc. v. BMG Music Pub.,*
  512 F.3d 522 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.,*
  964 F.2d 965 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Los Angeles News Service v. Reuters Television Int'l,*
  149 F.3d 987 (9th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lizalde v. Advanced Planning Services, Inc.,*
  875 F.Supp.2d 1150 (S.D. Cal. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*MAI Systems Corp. v. Peak Computer, Inc.,*
  991 F.2d 511 (9th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Massey v. Banning United School Dist.,*
  256 F. Supp.2d 1090 (C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.*
  545 U.S. 913, 125 S.Ct. 2764 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Micro Star v. FormGen Inc.,*
  154 F.3d 1107 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Monge v. Maya Magazines, Inc.,*
  688 F.3d 1164 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24

*Morongo Band of Mission Indians v. Rose,*
  893 F.2d 1074 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

*Núñez v. Caribbean Int'l News Corp.,*
  235 F.3d 18 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*OSU Student Alliance v. Ray,*
  699 F.3d 1053 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Perfect 10, Inc. v. Amazon. com, Inc.,*
  508 F.3d 1146 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11

*Perfect 10 v. Google, Inc.,*
  416 F.Supp.2d 828 (C.D. Cal. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Peter Letterese and Assoc., Inc. v. World Institute of Scientology Enter.,*
  533 F.3d 1287 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Religious Technology Center v. Netcom On-Line Communication Services, Inc.,*
  907 F.Supp. 1361 (N.D. Cal. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.,*
  806 F.2d 1393 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*(Continued On Next Page)*

**FEDERAL CASES (CONTINUED)**                     Page No.

*SMC Promotions, Inc v. sMC Promotions*,
   355 F.Supp.2d 1127 (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Sony Corp. of America v. Universal City Studios, Inc*.,
   464 U.S. 417, 104 S. Ct. 774 (1984) . . . . . . . . . . . . . . . . . . . . . . . .   14, 15, 19

*Stewart v. Abend*,
   495 U.S. 207, 110 S.Ct. 1750 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Supermarket of Homes v. San Fernando Valley Bd.*,
   786 F.2d 1400 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*Twentieth Century-Fox Film* Corp. v. Dunnahoo,
   637 F.2d 1338 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*Ty, Inc. v. Publ'ns Int'l Ltd.*,
   292 F.3d 512 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

*UMG Recordings, Inc. v. MP3.com, Inc*.,
   92 F.Supp.2d 349 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

*Warner Bros. Ent' Inc. v. WTV Systems, Inc*.,
   824 F.Supp.2d 1003 (C.D. Cal. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Worldwide Church of God v. Philadelphia Church of God*,
   227 F.3d 1110 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

*Zito v. Steeplechase Films, Inc.*,
   267 F.Supp.2d 1022 (N.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . .   17

**FEDERAL STATUTES / RULES**

Fed. R. Civ. Proc., Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . .   5, 12, 13, 25

17 U.S.C. § 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

17 U.S.C. § 107. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15, 16, 18, 24

17 U.S.C. § 410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

17 U.S.C. § 512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

**OTHER SOURCES**

Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* . . . . . . .   9, 17, 19

Senate Rep. No. 94-473 (1975) (Copyright Act of 1976). . . . . . . . . . . . . . . .   16

## I.  INTRODUCTION

Gossip website operator Gawker Media, LLC ("Defendant" or "Gawker") has made a business of predatory journalism, violating people's rights to make a buck. This time it went too far, expressly encouraging and engaging in copyright infringement in order to promote its own services and generate revenues.

While it may be newsworthy when an unpublished copyrighted work of a prominent writer is infringed, newsworthiness alone does not empower a media outlet to actively encourage and participate in another's brazen infringement under the pretense of news reporting, especially where, as here, that infringement was instigated by Gawker by its articles. Rather than merely publishing a news story reporting that Plaintiff Quentin Tarantino's ("Plaintiff" or "Tarantino") screenplay was leaked within limited Hollywood circles, Gawker crossed a line by promoting itself to the public as the first source to obtain the entire Screenplay illegally, and providing it.

Earlier this year, Tarantino learned that a copy of his original motion picture screenplay, *The Hateful Eight* (the "Screenplay"), had been copied without his permission and leaked among Hollywood circles. Seizing upon this, Gawker — itself admittedly unable to lay hands on the confidential Screenplay, which was at that point not available anywhere on the Internet nor outside of certain Hollywood circles — publicly solicited its purported 47 million monthly United States readers to infringe Tarantino's copyright, asking anyone to provide Gawker with an unauthorized copy.

Gawker's solicitation for the copyright infringement worked, as the next day, Gawker began promoting itself as the very first source for the public to be able to obtain the entire Screenplay. In a piece titled "*Here Is the Leaked Quentin Tarantino Hateful Eight Script*," Gawker posted a private in-line hyperlink to an obscure outside commercial file hosting website where defendant DOE-1 a/k/a AnonFiles.com was illegally distributing and making available for download a pirated copy of the Screenplay. Until publication of Gawker's article, online search engine searches for the Screenplay did not yield any positive results.

1   Gawker contrived the very "news story" that it now seeks to hide behind. That
2   the Screenplay had merely leaked to a limited number of individuals within the
3   confines of Hollywood was by that point already old news, having already been
4   reported by Gawker and various other news outlets. Gawker solicited and obtained
5   a theretofore publicly unknown link to an anonymous download site that was storing
6   and distributing to users infringing PDF copies of the complete copyrighted
7   Screenplay. Gawker then fabricated another, new "story" that the script had been
8   made publicly available online solely so that Gawker could then trumpet to the world
9   without impunity exactly where on the Internet the infringement was taking place,
10  reported as available "Here" on Gawker, thereby propagating such unauthorized
11  reproduction, distribution and display of the Plaintiff's work by AnonFiles.

12   Gawker could just as effectively have reported the fact that the script was
13  leaked and available on a file upload site without including any specific links to the
14  infringing copy, just as a newspaper can report that a film piracy ring in, *e.g.*,
15  downtown Los Angeles, has obtained and is selling pirated DVDs of a-not-yet
16  released theatrical motion picture without instructing exactly how, where and when
17  readers can illegally buy their own pirated copy. But it was not content to stop there,
18  and instead crossed the journalistic line to become an active inducer of the illegal
19  activity about which it was supposedly reporting. Gawker should be held culpable.

20  **II.   SUMMARY OF ARGUMENT**

21   Tarantino's Complaint adequately alleges extensive facts in support of *prima*
22  *facie* claims for direct copyright infringement against the Doe defendants, including
23  the operator of AnonFiles, who infringed his Screenplay by (*inter alia*) reproducing,
24  distributing and displaying unauthorized copies of it even after receiving a Digital
25  Millennium Copyright Act ("DMCA") 17 U.S.C. § 512 takedown notice from the
26  Plaintiff's representatives. The Complaint also sets forth a more than sufficient
27  factual basis for his claim of contributory infringement against Gawker who, with
28  knowledge that such downloadable copies were unauthorized, nonetheless induced,

1  caused and/or materially contributed to the Does' primary infringements. Although

2  it would be premature to consider on the pleadings alone, neither the Doe defendants'

3  nor Gawker's acts of copyright infringement would qualify as protected fair uses.

4  ## III.    FACTUAL BACKGROUND

5      Tarantino holds, by authorship, the exclusive copyright in the original

6  unpublished, unreleased motion picture screenplay *The Hateful Eight* (the

7  "Screenplay"), registered with the U.S. Copyright Office. Complaint ("Compl.") ¶ 15.

8      On January 21, 2014, Tarantino discovered that a copy of his unpublished

9  Screenplay had, without his authorization, been leaked to certain members of the

10  entertainment industry, albeit in a limited manner (*i.e.*, through January 23, there were

11  no positive online search engine results for a copy of the script). *Id.* ¶ 16.

12      On January 22, 2014, Gawker posted an article on its website about the

13  occurrence of the leaked script and about Tarantino's public statements on the matter.

14  As no copies were publicly available or locatable online, in its January 22nd article,

15  Gawker also solicited its readers to provide it with an unauthorized copy of the

16  Screenplay, stating: "if anyone would like to ... leak the script to us, please do so at

17  [email address]." *Id.* ¶ 17.  Thereafter, on January 23rd, Gawker posted another article

18  with universal resource locator ("URL") click-through links for the downloading of

19  a complete PDF copy of the unpublished registered Screenplay, hosted on the obscure

20  file upload website AnonFiles.com. In its January 23rd article, titled "*Here Is the*

21  *Leaked Quentin Tarantino Hateful Eight Script*," Gawker directed, encouraged and

22  solicited its readers and the general public with click-through URL links on where

23  and how (*i.e.*, "*Here*") to obtain an unauthorized downloadable copy of the

24  Screenplay. *Id.* ¶ 19. In its January 23rd article, Gawker encouraged Internet users to

25  download the PDF "document" and then read the Screenplay illegally, with the

26  invitation that the "document is 146 pages of pure Tarantino. Enjoy!," with the text

27  "146 pages" also a link to the downloadable copy of the Screenplay. Compl.  ¶ 19.

28

1    Tarantino's Screenplay was stored on AnonFiles.com only in the popular
2    portable document format ("PDF") file format, which by its very nature cannot simply
3    be viewed on a computer's screen without first being *completely downloaded* through
4    the Internet. *Id.* ¶¶ 1–3, 19–20. Thus, contrary to repeated suggestions throughout
5    Gawker's moving papers that its readers may have only merely "viewed" the
6    Screenplay on screen, anyone who clicked Gawker's links to read it thereby
7    necessarily must have (even inadvertently) made an automatic copy of the work on
8    their own computer, regardless of whether they ultimately saved a permanent copy.

9    Notwithstanding its receipt of repeated DMCA notices of infringement,
10   defendant DOE-1 a/k/a AnonFiles.com failed to expeditiously disable access to
11   and/or remove the infringing materials and then, even after the initial downloadable
12   Screenplay PDF file was disabled, a subsequent PDF file copy was made available
13   for download at the exact same AnonFiles URL. *Id.* ¶ 20. Likewise, notwithstanding
14   Tarantino's repeated demands and DMCA notice for the removal of its posted URL
15   links, Gawker expressly refused to remove the links to download the Screenplay. *Id.*

16   On January 26th, Gawker amended and updated its January 23rd article,
17   writing: "the script has been made public online here *and here*," to add the text "and
18   here" into its article — with the subsequent text "here" an additional URL click-
19   through link directly to another downloadable PDF copy of the complete Screenplay,
20   hosted on the website scribd.com, which appeared to have been a copy which
21   originated from the AnonFiles download copy. *Id.* ¶ 33.

22   Tarantino contends that Gawker intended to and did directly cause, contribute
23   to, enable, facilitate, aid, abet, induce and/or participate in the infringement of
24   Tarantino's copyrighted work committed by defendant DOE-1 a/k/a AnonFiles.com,
25   and the other Doe defendants, whose identities are currently unknown. As Gawker's
26   January 23rd article linked to the first (and otherwise unknown) incidence of the
27   complete Screenplay online, Gawker's article and links became the source for the
28   widespread public dissemination of the leaked script. Gawker's click-through links,

1  to the otherwise unknown complete copy of the Screenplay, were a material factor for

2  the general public to locate and unlawfully obtain the Screenplay. Compl. ¶ 19.

3  **IV.    MEMORANDUM OF POINTS & AUTHORITIES**

4     **A.    Motions to Dismiss Under Rule 12(b)(6) Are Disfavored**

5        Viewed with disfavor, motions to dismiss under Rule 12(b)(6) for failure to

6  state a claim are *rarely* granted. *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir.

7  2003). And, Rule 12(b)(6) motions are particularly unsuitable for adjudicating a fair

8  use defense to copyright infringement such as that advanced herein by Gawker. *Four*

9  *Navy Seals v. Associated Press*, 413 F.Supp.2d 1136, 1148 (S.D. Cal. 2005) (fair use

10  "issue is inappropriate for determination in a 12(b)(6) motion"). To avoid dismissal,

11  a plaintiff need only allege sufficient factual matter to state a claim to relief that is

12  plausible on its face. *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1061 (9th Cir.

13  2012), *cert. den.*, 134 S.Ct. 70 (2013). The factual allegations of the complaint must

14  be accepted as true and construed in the light most favorable to the plaintiff. *Id.*

15        "If a complaint is dismissed for failure to state a claim, leave to amend should

16  be granted unless the court determines that the allegation of other facts consistent

17  with the challenged pleading could not possibly cure the deficiency." *Schreiber*

18  *Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). This

19  policy favoring amendment is to be applied with "extreme liberality." *Morongo Band*

20  *of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

21     **B.    The Complaint States a Valid Claim Against Gawker for**

22          **Contributory Copyright Infringement**

23        Tarantino's Second Claim for Relief seeks liability against Gawker for

24  contributory copyright infringement. Compl. ¶¶ 31–41. Under this claim, liability

25  exists if the defendant engages in "personal conduct that encourages or assists the

26  [direct] infringement" of another. *A&M Records, Inc. v. Napster*, 239 F.3d 1004, 1019

27  (9th Cir. 2001) (citations and quotations omitted); *see, e.g.*, *Ellison v. Robertson*, 357

28  F.3d 1072, 1077–78 (9th Cir. 2004). To state a viable claim for contributory

copyright infringement, a plaintiff need only allege that the defendant (1) had knowledge of the infringing conduct of another and (2) induced, caused or materially contributed to the infringing activity. *A&M Records, Inc.*, 239 F.3d at 1019 (citations and quotations omitted). Both direct underlying infringement, and the elements for Gawker's contributory infringement, are more than adequately pled here.

### 1.   The Complaint States Valid Claims for Underlying Direct Copyright Infringement

Plaintiffs must satisfy just "two requirements to present a *prima facie* case of direct infringement: (1) . . . show ownership of the allegedly infringed material and (2) . . . demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *A&M Records, Inc.*, 239 F.3d at 1013; *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361, 111 S.Ct. 1282 (1991) (two elements of infringement).

### a.   Tarantino Authored and Owns the Screenplay

As to the first element, Tarantino contends (and Gawker does not dispute) that he owns the Screenplay, which he registered with the U.S. Copyright Office. Compl. ¶ 15. Such registration constitutes *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate of registration. 17 U.S.C. § 410(c).

### b.   The First Claim for Relief Alleges Direct Infringement By the Doe Defendants

As to the second element, Tarantino's First Claim for Relief alleges that the Doe defendants directly infringed the copyright in his Screenplay by disseminating complete, unauthorized downloadable PDF copies of the unreleased work. Compl. ¶¶ 21–30. In doing so, they have violated Tarantino's exclusive rights under Section 106 of the Copyright Act to, *inter alia*, reproduce the copyrighted work, distribute copies to the public and display the work publicly. 17 U.S.C. §§ 106(1), 106(3), 106(5).[1]

---

[1] *See* Compl. ¶ 24 ("Defendants have infringed Plaintiff's exclusive copyright in and to the Screenplay directly and indirectly by use, reproduction, display, transmission and/or

1  Unsuccessfully attempting to construct a proverbial straw man, Gawker asserts
2  that secondary liability cannot exist in the absence of direct infringement and then
3  erroneously suggests that the Plaintiff's claim against it is premised only on
4  underlying acts of direct infringement committed by unknown Internet users who
5  accessed the Screenplay through the links posted by Gawker on its site.

6  To the contrary, as plainly articulated in the pleadings and discussed further
7  herein, that is not Tarantino's only claim or theory of direct infringement in this case,
8  but one of multiple co-existing theories and pled claims. Instead, by his First Claim
9  for Relief, he clearly contends that the *Doe defendants* directly infringed his Section
10  106 rights by reproducing, distributing and displaying unauthorized copies of the
11  Screenplay to such Internet users. Compl. ¶¶ 21–30.[2]

12  Defendant "*DOE-1 a/k/a AnonFiles.com, and Does 2-10 . . . —* whether
13  directly and/or by permitting or facilitating a user of its site to do so — uploaded and
14  posted, and made available to the public, unauthorized copies of the Screenplay." *Id.*
15  ¶ 23 (emphasis added). The Doe defendants' "copying of, use, reproduction,
16  distribution, display, transmission and/or dissemination of copies of the Screenplay
17  . . . is unauthorized, and constitutes an infringement of Plaintiff's rights, including of
18  the Screenplay copyright, and violation of copyright law." *Id.* ¶ 24. Gawker, "with
19  knowledge of the infringing activity, induced, solicited, encouraged, caused or
20  materially contributed to *the infringing conduct of DOE-1 a/k/a AnonFiles.com and*
21  *DOES 2-10*" by driving traffic to their websites. Compl. ¶ 34 (emphasis added).

22
23  dissemination of the copyrighted work, causing the copyrighted work to be copied and
    distributed, all without the consent of Plaintiff").

24  [2]  At least one of the Doe defendants in this case (DOE-1 a/k/a AnonFiles.com) is alleged
    to have operated a commercial file-hosting service, the primary function of which is to
25  store copies of digital files for download. *See* Compl. ¶¶ 18–20. In a case involving
    infringement by an analogous download service to that of AnonFiles, the Court described
26  such a site's operation: "A visitor . . . can upload electronic files to the website. That
    information is then stored on [its] servers, on which [the defendant] can save and host
27  millions of files. The visitor, in turn, receives a unique link that . . . acts as a locator,
    allowing anyone with the link to click it or to plug it into a web browser and then to
28  download the file originally uploaded." *Disney Enterprises, Inc. v. Hotfile Corp.*, 798
    F.Supp.2d 1303, 1306 (S.D. Fla. 2011) .

As set forth in Tarantino's Complaint, such factual allegations are clearly more than sufficient to state a legally cognizable claim against the Doe defendants for direct copyright infringement under contemporary federal notice pleading standards. *Browne v. McCain*, 612 F.Supp.2d 1125 (C.D. Cal. 2009) (denying Rule 12(b)(6) motion to dismiss copyright infringement claim); *Lizalde v. Advanced Planning Services, Inc.*, 875 F.Supp.2d 1150, 1160 (S.D. Cal. 2012) (same);

### c.   The Complaint Also Alleges Direct Infringement By Internet Users Via Gawker's Links

However, as to the second element for the underlying direct infringement, even if Tarantino's claim for contributory liability *were* only premised on members of the public directly infringing his Screenplay via their use of Gawker's links and their downloading of the Screenplay, then there would still be ample support for his claims — sufficient to survive a challenge on the pleadings. See, Compl. ¶¶ 1-3, 19-20.

Crucially, infringing copies of Tarantino's Screenplay at issue in this case were made available to Internet users via AnonFiles.com only in a PDF format, which by definition cannot be viewed on screen without first being *completely downloaded* by the computer. *Id.*, ¶¶ 1–3, 19–20.[3] Downloading a complete, unauthorized copy of a

---

[3] Throughout its Motion to Dismiss ("Mtn to Dismiss"), Gawker seemingly fabricates, in an attempt to confuse the relevant issues, that somehow the Screenplay was merely read online by users. In doing so, Gawker then erroneously cites *Perfect 10, Inc. v. Amazon. com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) for the incorrectly stated blanket proposition that viewing an unauthorized digital copy of a copyright-protected work on a computer alone can never constitute infringement. See, Mtn to Dismiss at 6:21–22. That is not what *Perfect 10* held. Regardless, that is not what happened here, nor what is alleged in the complaint. The complaint repeatedly alleges – which must be accepted as true – that Internet users infringed Tarantino's copyright by following Gawker's get it "*Here*" links to and actually downloaded the PDF of the Screenplay. Compl. ¶¶ 1–3, 19–20, 33. If a user clicked the "download" link – the only option to view or obtain the file – the PDF file necessarily is downloaded. But even if (contrary to the allegations of the complaint,) Tarantino's Screenplay had not been made available only as a downloadable PDF, Internet users who clicked, accessed and viewed the Screenplay would still be in direct infringement of the work even if they did not permanently save or print copies. *Intellectual Reserve v. Utah Lighthouse Ministry*, 75 F.Supp.2d 1290, 1294 (D. Utah 1999). "When a person browses a website, and by so doing displays the [Screenplay] a copy of [it] is made in the computer's random access memory (RAM), to permit viewing of the material. And in making a copy, even a temporary one, the person who browsed infringes the copyright." Id. (citing *MAI Systems Corp. v. Peak Computer*, 991 F.2d 511,

1   work constitutes infringement. *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d

2   1020, 1034 (9th Cir. 2013). "Both uploading and downloading copyrighted material

3   are infringing acts. The former violates the copyright holder's right to distribution,

4   the latter the right to reproduction." *Id.* (citations omitted).

5        Tarantino clearly pleads that the actual download "dissemination of

6   unauthorized copies of the copyrighted work" occurred as a result of Gawker, that

7   "the copyrighted work [was] copied and distributed worldwide" "through [Gawker's]

8   article and specific URL click-through links therein." Compl., ¶¶ 1–3, 19–20, 34–35.

9   A user cannot simply "read" the Screenplay on Anonfiles.

10       "Additionally, a person making a printout or re-posting a copy of the

11   [Screenplay] on another website would infringe plaintiff's copyright." *Intellectual*

12   *Reserve*, 75 F.Supp.2d at 1294. Although the Complaint may not explicitly identify

13   one particular, known individual who downloaded or printed copies of the

14   Screenplay, Gawker's alleged actions were "substantially certain to result in such

15   direct infringement" and Tarantino pleads that actual infringement occurred.[4] *Perfect*

16   *10, Inc.*, 508 F.3d at 1171; See, Compl., ¶¶ 1–3, 19–20, 34–35.

17       Thus, as Tarantino's Complaint more than sets forth factual allegations

18   sufficient to state a legally cognizable claim for underlying direct copyright

19   infringement, the proper focus moves to the issue of the sufficiency of the allegations

20   of contributory infringement, which are also more than adequately pled.

21                **2.    Gawker Had Knowledge of the Infringing Activity**

22       As to the first element for contributory infringement, Plaintiff sufficiently

23   alleges that Gawker "had knowledge of the infringing conduct of another." *A&M*

24   *Records, Inc.*, 239 F.3d at 1019 (citations omitted); See, Compl. ¶¶2-3, 17, 19-20, 33.

25

26   518 (9th Cir.1993); *see also*, Melville B. Nimmer and David Nimmer, Nimmer on
     Copyright § 8.08(A)(1) (infringing act of copying may occur from "loading the
27   copyrighted material ... into the computer's . . . . (RAM)")).

28   [4] Any perceived flaw in the pleadings could easily be cured by amendment. *Morongo
     Band of Mission Ind.*, 893 F.2d at 1079 (leave granted with "extreme liberality").

According to Tarantino's allegations, Gawker was fully aware that infringing copies of Tarantino's Screenplay were available using the link posted on Gawker's website.[5] Gawker knew the Screenplay was subject to copyright, and knew the PDF "document" copy that could be downloaded through Anonfiles was unauthorized. This is evidenced by Gawker's own words "*Here Is The* **Leaked** *. . . Script*," and Gawker exhorting its readers to click on the link to Anonfiles to the "document" to "Enjoy!" it. Compl. ¶¶ 19, 33. In addition, Gawker was served with DMCA notices confirming what it already knew, and still Gawker kept the link up.[6] Compl. ¶¶ 3, 36.

### 3.    Gawker Induced, Caused and/or Materially Contributed to the Infringing Conduct

As to the second element for contributory copyright infringement, Plaintiff sufficiently alleges that Gawker "induced, caused or materially contributed to the infringing activity." *A&M Records, Inc.*, 239 F.3d at 1019 (citations omitted). Federal courts have repeatedly demonstrated that a defendant such as Gawker may be held contributory liable where, as here, it posts one or more links on the Internet directing visitors to where they can find illicit content elsewhere online, thereby encouraging and perpetuating infringing activity.[7]

The Ninth Circuit has "acknowledge[d] that services or products that facilitate access to websites throughout the world can significantly magnify the effects of

---

[5]  A second link to a copy of the Screenplay, apparently a result of Gawker's post of the initial link, was added by Gawker into its Jan. 23rd article several days later. Compl. ¶ 33.

[6]  Even in the absence of such explicit knowledge and notice, Gawker would still be chargeable with knowledge because "an actor may be contributorily liable for intentionally encouraging direct infringement if the actor knowingly takes steps that are substantially certain to result in such direct infringement." *Perfect 10, Inc.*, 508 F.3d at 1171. "Under such circumstances, intent may be imputed." *Id.* at 1172.

[7]  *See, e.g.*, *Columbia Pictures Industries, Inc.*, 710 F.3d at 1036 (affirming liability for contributory infringement where defendant provided links to torrent files for copyrighted movies); *Arista Records, Inc. v. MP3Board, Inc.*, No. 00 Civ. 4660, 2002 WL 1997918 (S.D.N.Y. Aug. 28, 2002) (denying motion for summary judgment by defendant who hosted links to sites containing unauthorized audio files); *Intellectual Reserve*, 75 F.Supp.2d at 1295 (preliminary injunction against website operator who posted links to infringing copies of work hosted elsewhere).

otherwise immaterial infringing activities." *Perfect 10, Inc.*, 508 F.3d at 1172 (citations omitted). "Moreover, copyright holders cannot protect their rights in a meaningful way unless they can hold providers of such services . . . accountable for their actions . . ." *Id.* at 1172 (citation omitted); *See also*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913, 928–29, 125 S.Ct. 2764 (2005).

*Perfect 10, Inc.* is instructive. In that case, an owner of copyrights in various photographic images brought a copyright infringement suit against the operator of popular online search engine Google.

> Some website publishers republish Perfect 10's images on the Internet without authorization. Once this occurs, Google's search engine may automatically index the webpages containing these images and provide thumbnail versions of images in response to user inquiries. When a user clicks on the thumbnail image returned by Google's search engine, the user's browser accesses the third-party webpage and in-line links to the full-sized infringing image stored on the website publisher's computer.

*Perfect 10, Inc.*, 508 F.3d at 1157. Although the district court preliminarily enjoined Google from creating and publicly displaying thumbnail versions of Perfect 10's photographs, it did not enjoin Google from linking to third-party websites that displayed infringing full-size versions of Perfect 10's images. *Perfect 10 v. Google, Inc.*, 416 F.Supp.2d 828 (C.D. Cal. 2006) *rev'd in part*, 508 F.3d at 1177.

The Ninth Circuit Court of Appeals reversed and remanded, saying: "Google substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access infringing materials. We cannot discount the effect of such a service on copyright owners . . . ." *Perfect 10, Inc.*, 508 F.3d at 1172. "Google could be held contributorily liable if it had knowledge that infringing Perfect 10 images were available using its search engine, could take simple measures to prevent further damage to Perfect 10's copyrighted works, and failed to take such steps." *Id.*

That is similar to what happened here. Gawker (who, as discussed above, admittedly knew of the Does' infringing activity) had the ability to simply remove from its website the multiple direct URL links to infringing postings of downloadable

1  PDF copies of the complete Screenplay. But to this day, Gawker has obstreperously
2  failed and refused to take such simple steps, even after receipt of valid DMCA notice.
3  Compl. ¶36. By its actions and omissions, Gawker has thereby induced, caused and/or
4  materially contributed to the Does' unauthorized "reproduction, distribution, display,
5  transmission and/or dissemination of copies of the Screenplay." *Id.* ¶ 24.

6      Furthermore, Gawker is alleged in the Complaint to have engaged in another,
7  separate act of contributory copyright infringement when it "encouraged an infringing
8  unauthorized full copy of the Screenplay to be posted for download . . . ." *Id.* ¶ 18.[8]
9  Once, through discovery, Tarantino is able to find out the identity of the individual(s)
10  who did so, he will promptly seek to add them as additional Doe defendants.

11      Tarantino's allegations therefore plainly state at least one, if not more,
12  potentially cognizable claims against Gawker for contributory copyright
13  infringement. *Disney Enterprises, Inc.*, 798 F.Supp.2d at 1310 (denying Rule 12(b)(6)
14  motion to dismiss contributory and vicarious copyright infringement claims).

15      **C.   It is Inappropriate to Analyze Gawker's Fair Use Defense Now**

16      "Defendants devote many pages of briefing to their argument that their use .
17  . . was a non-infringing fair use." *Four Navy Seals*, 413 F.Supp.2d at 1148. However,
18  as noted above, courts very rarely analyze fair use simply based on the pleadings
19  alone. *See*, *e.g.*, *id.* (the "issue is inappropriate for determination in a 12(b)(6) motion,
20  since fair use is an affirmative defense to an infringement claim").

21          Generally, when analyzing a Rule 12(b)(6) motion, a court's analysis of the
22          plaintiff's claims is limited to its allegations in the complaint. At this stage,
        a court does not make factual findings, nor deem material facts undisputed
23          or admitted. Thus, in light of a court's narrow inquiry at this stage and
        limited access to all potentially relevant and material facts needed to
24          undertake the analysis, courts rarely analyze fair use on a 12(b)(6) motion.

*Browne*, 612 F.Supp.2d at 1130 (citing, *inter alia*, *Dr. Seuss Enter., L.P. v. Penguin*
25
*Books USA*, 109 F.3d 1394, 1403 (9th Cir. 1997) ("a silent record on an important
26

27    [8]  "Gawker Media posted an article on the 'Defamer' section of its Gawker Website" in
which it "actively solicited its readers to provide it with an unauthorized infringing copy
28  of the Screenplay, stating 'if anyone would like to . . . leak the script to us, please do so at
[email address].'" Compl. ¶ 18.

1   factor bearing on fair use disentitle[s] the proponent of the defense" to relief)).[9]

2       It would be premature and inappropriate to attempt to meaningfully analyze

3   Gawker's affirmative defense of fair use at this extremely early stage of the litigation.

4   "The facts, as alleged in the complaint, are simply insufficient to conduct a thorough

5   analysis of fair use at this time. The parties have not had a full opportunity to conduct

6   discovery. As a result, Plaintiff is not yet aware of all relevant and material facts

7   supporting his claim and potentially refuting [Gawker]'s fair use defense." *Id.* "Thus,

8   given the early stage of this case, undeveloped factual record, limited factual

9   allegations in the Complaint, existence of potentially disputed material facts, and

10  nature of the Court's inquiry on a 12(b)(6) motion, the Court" should decline

11  Gawker's "invitation to undertake the fair use analysis at this time." *Id.*[10]

12      Nonetheless, were the Court still inclined to do so at this premature time, then

13  fair use would still be of no avail to the Defendants in this case.

14  ### D.    The Fair Use Doctrine Does Not Absolve Gawker of Liability

15      The very limited doctrine of fair use, which "permits courts to avoid rigid

16  application of the copyright statute when, *on occasion*, it would stifle the very

17  creativity which that law is designed to foster," has no application to the present

18  situation and does not excuse Defendants from their liability for willfully infringing

19  Tarantino's copyright. *Harper & Row v. Nation Enter.*, 471 U.S. 539, 550, 105 S. Ct.

20  2218 n.3 (1985) (citations omitted; emphasis added).

21      As a preliminary matter, it is important to focus on exactly *whose* unauthorized

---

[9]   "[C]ourts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses. Rule 12(b)(6) tests whether the complaint states a claim for relief, and a plaintiff may state a claim even though there is a defense . . .. The mere presence of a potential affirmative defense does not render the claim for relief invalid." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (citation omitted).

[10]   Notwithstanding the Court's highly limited access to potentially relevant and material facts necessary to undertake the analysis, Gawker suggests that it may nonetheless occasionally be possible to consider fair use on a motion to dismiss where no material facts are in dispute. Mtn to Dismiss at 11:1–13. While that may sometimes be so, the viability of Gawker's affirmative defense is not apparent from the face of the Complaint and there *are* significant disputed material facts, such as, *e.g.*, the potential effect of the defendants' misconduct on the market for Tarantino's work.

"use" of the Plaintiff's Screenplay is or is not a fair one — that of the primary infringers (*i.e.*, the Doe defendants) or rather the contributory infringer (Gawker). *See Lewis Galoob Toys, Inc.*, 964 F.2d at 970 ("Much of the parties' dispute regarding the fair use defense concerns the proper focus of the court's inquiry: (1) Galoob or (2) consumers who purchase and use the Game Genie").

The correct focus here is, of course, placed on the unauthorized use actually made by the primary infringers because, as Gawker points out, secondary liability for copyright infringement cannot be found in the absence of direct liability. *Id.* ("The district court properly focused on whether consumers who purchase and use the Game Genie would be infringing Nintendo's copyrights"). Attempting to brush off the Ninth Circuit's guidance of *Lewis Galoob Toys* as "merely dicta,"[11] Gawker would instead have the Court attempt to analyze Gawker's own misconduct. But it would be a nonsensical endeavor to attempt to evaluate whether it engaged in fair *use* where, by its own admission, "Gawker did not actually 'use' the script". Mtn to Dismiss, 20:23.

Indeed, the only time that the U.S. Supreme Court has ever applied a fair use defense to claims of secondary liability for copyright infringement, it correctly and exclusively focused on the conduct of those alleged to be primarily infringing. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 447–56, 104 S. Ct. 774 (1984) (consumers' unauthorized home time-shifting of tv programs is legitimate fair use). Likewise, since deciding *Lewis Galoob Toys*, the Ninth Circuit has demonstrated that, especially in the context of online copyright infringements, the appropriate analysis centers on the primary infringers' actions. See, *e.g.*, *A&M Records, Inc.*, 239 F.3d at 1014–19 ("Napster users do not have a fair use defense").

The appropriate focus is thus placed on whether the Doe defendants' wholesale infringement of Tarantino's Screenplay can be excused as fair use. It cannot.

---

[11] Actually, it was *Lewis Galoob Toys'* entire fair use analysis that the Ninth Circuit later characterized *generally* as "dicta" because it was unnecessary in light of the court's holding that audiovisual displays created by the Game Genie were not derivative works. *Micro Star v. FormGen Inc.*, 154 F.3d 1107, 1113 (9th Cir. 1998). *Micro Star* is further inapplicable because it was a case of direct rather than for secondary liability. *Id.*

1.   **The Primary Infringers' Use of the Screenplay Was Not Fair**

The Copyright Act sets forth four non-exclusive factors to be considered in determining whether the use made of a work in any particular case is a fair use. 17 U.S.C. § 107. "All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578, 114 S.Ct. 1164 (1994).

a.   **The Purpose and Character of Use Weigh Against a Finding of Fair Use**

(1)   **The Use Was Not Transformative**

The first statutory factor mandates an analysis of "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). This "central purpose" of this factor is to ask "whether and to what extent the new work is 'transformative'" — that is, whether the defendants simply supersede or supplant the original work, or instead adapt it by adding something new, with a further purpose or different character. *Campbell*, 510 U.S. at 579; *see*, *e.g.*, *Dr. Seuss Enter., L.P.*, 109 F.3d at 1399–1401.

Here, the Screenplay was reproduced, distributed and displayed as a downloadable PDF without Tarantino's authorization in its entirety, with absolutely no transformation or modification whatsoever. Compl. ¶ 2. "Because there is no effort to create a transformative work with new expression, meaning, or message, the infringing work's commercial use further cuts against the fair use defense." *Dr. Seuss Enter., L.P.*, 109 F.3d at 1401 (quotations omitted).

(2)   **The Use Was Commercial**

The first fair use factor also requires consideration of whether the Defendants' use "is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). "[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. of America*, 464 U.S. at 451.

1   "Direct economic benefit is not required to demonstrate a commercial use.

2   Rather, repeated and exploitative copying of copyrighted works, even if the copies

3   are not offered for sale, may constitute a commercial use." *A&M Records, Inc.*, 239

4   F.3d at 1015; *see also*, *e.g.*, *Worldwide Church of God v. Philadelphia Church of*

5   *God*, 227 F.3d 1110, 1118 (9th Cir. 2000) (church that copied religious text for its

6   members "unquestionably profit[ed]" from the unauthorized "distribution and use").

7   Here, far from being a "nonprofit educational" endeavor (17 U.S.C. § 107(1)),

8   defendant DOE-1 a/k/a AnonFiles.com is alleged to be operating a commercial for-

9   profit file hosting service, which appears to be supported at least in part by "pop-up"

10  advertisements paid for by third parties. *See* Compl. ¶¶ 12, 18–20;

11  http://anonfiles.com/. By attracting Internet traffic from users seeking access to the

12  Screenplay, it presumably generated additional advertising revenues from its

13  unauthorized use of Tarantino's work. This factor therefore cuts against fair use.

14   **b.   The Nature of the Copyrighted Work Weighs Against**

15   **a Finding of Fair Use**

16  The next fair use factor is "the nature of the copyrighted work."  17 U.S.C. §

17  107(2). Because the Screenplay is a confidential, unpublished work of fiction (Compl.

18  ¶ 16), this factor also weighs very heavily against a finding of fair use. *Harper &*

19  *Row*, 471 U.S. at 564 ("A use that so clearly infringes the copyright holder's interests

20  in confidentiality and creative control is difficult to characterize as 'fair'").

21   **(1)   The Screenplay Is Unpublished**

22  "The fact that a work is unpublished is a critical element of its 'nature.' . . .

23  [T]he scope of fair use is narrower with respect to unpublished works." *Id.*, *and see*

24  Senate Rep. No. 94-473, at 64 (1975) ("applicability . . . to unpublished works is

25  narrowly limited since, although the work is unavailable, this is the result of a

26  deliberate choice . . . of the copyright owner"). "The right of first publication

27  encompasses not only the choice whether to publish at all, but also the choices of

28  when, where, and in what form . . ." *Harper & Row*, 471 U.S. at 564. "Under ordinary

circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." *Id.* at 565.

Gawker tries to minimize this crucial factor by falsely asserting that Tarantino's Screenplay was already publicly available at the time that Gawker posted links directing readers on where and how to obtain an unauthorized downloadable PDF copy of it. But the pleadings (which must be accepted as true) plainly allege the opposite to be so: "the general public would not have known about or found the complete copy of the Screenplay on the AnonFiles Website if not for Gawker Media's article post and specific click-through URL links to the Screenplay." Compl. ¶ 19.

And "online search engine searches for a copy of the script, through January 23, did not have any positive results" until *after* Gawker widely publicized to the public where to obtain it. *Id.* ¶ 16. Indeed, Gawker <u>admits</u> the Screenplay wasn't locatable or available to the public, as it was apparently itself previously unable to find the Screenplay anywhere online or otherwise, leading it to make a plea to and solicit one of its millions of readers to provide it with an unauthorized copy: "if anyone would like to ... leak the script to us, please do so at [email address]." *Id.* ¶ 17.

Additionally, for purposes of copyright law, a work being "publicly available" is not at all synonymous with it having been "published" where, as here, it was disseminated without the authority of its owner. *Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1344 (9th Cir. 1981); *Zito v. Steeplechase Films, Inc.*, 267 F.Supp.2d 1022, 1026 (N.D. Cal. 2003). Indeed, "the very concept of publication implies the authority of the copyright owner." *Nimmer on Copyright* § 7.03 n.6.[12]

_____

[12]  Gawker's reliance on the non-controlling authority of *Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000) for Gawker's proposition "that the unpublished nature of the works becomes less critical" where they "have already been distributed publicly — in an authorized ***or unauthorized*** manner" is misleading at best, as *Núñez* did <u>not</u> in fact articulate any such rule. Mtn to Dismiss, 19:1–4 (emphasis added). To the contrary, while the photographs at issue in that case had not been previously published, they had in fact been commissioned "for the very purpose of semi-public dissemination," which the plaintiff took part in. *Id.* at 24. <u>Gawker was recently reprimanded by another federal court for similar misrepresentative advocacy.</u> *Araya v. Deep Dive Media, LLC and Gawker Media*, 5:12-CV-163, 2013 WL 4494881 (W.D.N.C. Aug 20, 2013) ("So, not only does

1  Thus, contrary to Gawker's erroneous and misleading suggestions, the
2  Screenplay plainly had not "already . . . been published by others" within the meaning
3  of fair use jurisprudence. Mtn to Dismiss at 3:26–27; *see also id.* at 21:2.

4  ### (2)   The Screenplay Is a Creative Work

5  The second statutory fair use factor also "calls for recognition that some works
6  are closer to the core of intended copyright protection than others, with the
7  consequence that fair use is more difficult to establish when the former works are
8  copied." *Campbell*, 510 U.S. at 586 (citations omitted). Under this factor, "the more
9  creative a work, the more protection it should be accorded from copying;
10  correlatively, the more informational or functional the plaintiff's work, the broader
11  should be the scope of the fair use defense." *Leadsinger, Inc. v. BMG Music Pub.*,
12  512 F.3d 522, 531 (9th Cir. 2008) (citation and quotations omitted); *see also Stewart*
13  *v. Abend*, 495 U.S. 207, 237, 110 S.Ct. 1750 (1990) ("fair use is more likely to be
14  found in factual works than in fictional works").

15  Because Tarantino's Screenplay is "a work of creative expression, as opposed
16  to an informational work, which is precisely the sort of expression that the copyright
17  law aims to protect," this factor again weighs against a finding of fair use.
18  *Leadsinger, Inc.*, 512 F.3d at 531.

19  ### c.   The Amount and Substantiality of the Portion Used
20  ### Weighs Against a Finding of Fair Use

21  The third factor provided by the Copyright Act is "the amount and
22  substantiality of the portion used in relation to the copyrighted work as a whole." 17
23  U.S.C. § 107(3). "Whatever the use, the portion of the copyrighted work that is taken
24  must be reasonable; in other words, this third factor examines whether defendants
25  have 'helped themselves overmuch' to the copyrighted work in light of the purpose
26  and character of the use." *Peter Letterese and Assoc., Inc. v. World Institute of*
27  *Scientology Enter.*, 533 F.3d 1287, 1314 (11th Cir. 2008) (quoting *Campbell*, 510

28  the [Gawker] misapply the facts of the [case], but it misstates the holding as well . . .").

1  U.S. at 587). "The inquiry is whether the amount taken is reasonable in light of the

2  purpose of the use and the likelihood of market substitution." *Id.* at n.30.

3  Because 100 percent of the Screenplay was reproduced, distributed and

4  displayed as a downloadable PDF in its entirety without Tarantino's authorization

5  (Compl. ¶ 2), the third factor likewise weighs against fair use in this case.

6  *Supermarket of Homes v. San Fernando Valley Bd.*, 786 F.2d 1400, 1409 (9th Cir.

7  1986) (no fair use where defendant copied the entire work verbatim; "no more of a

8  work may be copied than is necessary for the particular use").[13]

9  **d.    The Effect of Use Upon the Potential Market Weighs**

10  **Against a Finding of Fair Use**

11  The fourth and "single most important element of fair use" also weighs equally

12  strongly in favor of Tarantino. *Harper & Row*, 471 U.S. at 566.  This factor "poses

13  the issue of whether unrestricted and widespread conduct of the sort engaged in by

14  the defendant (or by others) would result in a substantially adverse impact on the

15  potential market for or value of the plaintiff's work." *Nimmer on Copyright* §

16  13.05[A][4] (notes omitted). Where, as here, the defendants' "use is for commercial

17  gain, that likelihood may be presumed."  *Sony Corp. of America*, 464 U.S. at 451.

18  Even in the absence of such a presumption, however, unrestricted and

19  widespread copying, distribution and public display of Tarantino's screenplays would

20  most certainly have a significant impact on his livelihood. As is alleged in the

21  

22  [13]  Gawker contends that, even if the entirety of Tarantino's work was used here, "the
mere fact that all of a work is copied is not determinative of the fair use question." Mtn to
Dismiss at 21:25–26 (quoting *Religious Technology Center v. Netcom On-Line Comm.*

23  *Services, Inc.*, 907 F.Supp. 1361, 1380 (N.D. Cal. 1995)). However, the "copying of an
entire work ***will*** *ordinarily* militate against" a finding that such wholesale

24  misappropriation was fair. *Religious Tech. Center*, 907 F.Supp. at 1380. Nor do courts
"*routinely* find fair use notwithstanding use of entire works," as the Defendant claims;

25  Quite the opposite is so, in fact. Mtn to Dismiss at 2:27 (emphasis added). Critically,
Gawker truncates the most important part of the passage quoted in its brief, *viz.*: "the

26  mere fact that all of a work is copied is not determinative of the fair use question, *where
such total copying is* **essential** *given the purpose of the copying.*" *Id.* (emphasis added)

27  citing *Sony Corp.*, 464 U.S. 417 (allowing total copying in context of time-shifting
copyrighted television shows by home viewers)). It was not at all "essential" to copy

28  Tarantino's Screenplay in its entirety, as explained herein. Gawker has again engaged in
similar type of misrepresentative conduct that it was reprimand for in *Araya, supra*.

pleadings and to be proven at trial with extensive evidence,[14] that, in addition to use as a film, the "Plaintiff routinely publishes his screenplays for substantial advances and royalties." Compl. ¶ 16. As a literary work *per se*, this Screenplay thus "has an independent economic value and is, in itself, viable." *Columbia Pictures v. Krypton Broadcasting*, 259 F.3d 1186, 1193 (9th Cir. 2001) (citations and quotations omitted).

Consequently, if anyone were free to give away complete, downloadable copies of copyright-protected scripts authored by Tarantino without any legal repercussions whatsoever, then it logically follows that he would not be able to sell as many authorized, published copies of his works -- and a film based on it as a previously unpublished script is diminished even more so. *See A&M Records, Inc.*, 239 F.3d at 1017 ("Having digital downloads available for free on the Napster system necessarily harms the copyright holders' attempts to charge for the same downloads"). Such an inference of market harm "simply makes common sense[] when a commercial use amounts to mere duplication of the entirety of an original . . . ." *Campbell*, 510 U.S. at 591 (citation and quotations omitted).

The balance of the above factors, taken together with the public interest, demonstrates that a fair use was not made here. The Screenplay is a confidential, unpublished work of fiction. It was copied wholesale for commercial purposes, with absolutely no modification or commentary added. Such use was non-transformative and threatens to supplant the market for Plaintiff's works. Balancing these statutory factors, taken together with the public interest, compels a finding of no fair use.[15]

---

[14]   Attempting to effectively evaluate the fourth fair use factor in the absence of any factual record only highlights why, "in light of a court's narrow inquiry at this stage and limited access to all potentially relevant and material facts needed to undertake the analysis, courts rarely analyze fair use on a 12(b)(6) . . ." *Browne*, 612 F.Supp.2d at 1130.

[15]   As this Court has observed, "it is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *Warner Bros. Ent' Inc. v. WTV Systems, Inc.*, 824 F.Supp.2d 1003, 1015 (C.D. Cal. 2011) (citations omitted). Indeed, "copyrighted works must be protected as an incentive for people to create new works." *SMC Promotions, Inc v. sMC Promotions*, 355 F.Supp.2d 1127, 1137–38 (C.D. Cal. 2005) (citations omitted).

2. **Gawker's Purported "Use" of the Screenplay Was Not Fair**

As explained above, the only appropriate inquiry here is as to whether the Doe defendants' infringement of Tarantino's Screenplay can be excused as fair use, not whether Gawker — the alleged contributory infringer — somehow instead qualifies to invoke this affirmative defense itself. Nonetheless, were the Court inclined to so inquire, then it will again become apparent that fair use is still of no avail. "Without a single factor tipping in its favor," Gawker plainly "has not met its burden." *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1184 (9th Cir. 2012).

a. **The Purpose and Character of Use Weigh Against a Finding of Fair Use**

(1) **The Use Was Not Truly for News Reporting**

"Waving the news reporting flag is not a get out of jail free card in the copyright arena."[16] *Monge*, 688 F.3d at 1183. The Ninth Circuit has warned that, in such cases, "[t]he promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report' of the [work]." *Id.* at 1173 (quoting *Harper & Row*, 471 U.S. at 557).

Gawker's "use" of hyperlinks to the entire downloadable Screenplay does not qualify as *bona fide* news reporting because the links alone served no legitimate journalistic purpose. Merely reporting that the script had leaked is not at all the same as providing unfettered access to the work as a whole; Gawker could just as effectively have written that the script was available elsewhere online without providing readers with any direct guidance to obtain a complete infringing copy.[17]

---

[16] The Ninth Circuit has repeatedly held that "publication of photographic [or material] evidence that constitutes proof of a newsworthy event is not automatically fair use, . . ." especially when use of the material was "not even necessary to prove that controverted fact," as there were other means available. *Monge*, 688 F.3d at 1174 and1175.

[17] Similarly, for instance, although complete digital copies of Tarantino's past films may be available somewhere on the Internet for pirating, Gawker could not legitimately seek out, aggregate and publish illicit links to them under the pretense that it was only "reporting" such piracy as news. *See*, *e.g.*, *Columbia Pictures Industries, Inc.*, 710 F.3d at 1036. That the Screenplay is a literary work rather than a video does not alter this result.

1

**(2)     The Use Was Not Transformative**

2   Gawker argues that its "use" of the Screenplay was transformative because it
3   was for a purpose other than producing a motion picture. However, "difference in
4   purpose is not quite the same thing as transformation, and [the Supreme Court]
5   instructs that transformativeness is the critical inquiry under this factor." *Monge,* at
6   1176 citing *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998).[18]
7   As discussed above, the Screenplay is a commercially viable literary work
8   independent of any film that might ultimately be made from it. Compl. ¶ 16.

9   And the copies of the Screenplay to which Gawker's links led were not in any
10  way transformative -- they were just PDFs generated by scanning an entire hard copy
11  of the script. "Courts have been reluctant to find fair use when an original work is
12  merely retransmitted in a different medium." *A&M Records, Inc.*, 239 F.3d at 1015
13  (*citing*, *e.g.*, *Infinity Broadcast Corp.*, 150 F.3d at 108; *UMG Recordings, Inc. v.*
14  *MP3.com, Inc.*, 92 F.Supp.2d 349, 351 (S.D.N.Y. 2000)).[19]

15  It is not as if Gawker merely linked to a limited portions of or highlights from
16  the Screenplay, let alone offered any original critical commentary or critique to
17  portions thereof.[20] Rather, Gawker impudently directed visitors to a complete,
18  unadorned downloadable PDF copy and directed them to "Enjoy!" The Plaintiff's

19

20  [18]  Gawker's argument that publication of the complete work for purposes of a news story
      amounted to transformation is nearly identical to that of Maya's in *Monge*, who "relie[d]
21    heavily on *Núñez*," the position of which the Ninth Circuit expressly rejected, finding the
      case "distinguishable" from Maya's use, just as it is from Gawker's use. *Id.* at 1175. The
22    *Monge* Court found that, "[a]lthough *Núñez* also involved news reporting, the similarities
      end there" for Maya, having "left the inherent character of the [work] unchanged, just as
23    it ends there for Gawker's unnecessary use of the complete original work. *Id.* at 1175-76.

24  [19]  See also, *Monge*, 688 F.3d at 1174 ("Transformation in the news reporting context has
      been litigated repeatedly in [the Ninth] circuit ..." and, in such context, the Ninth Circuit
25    "stated that despite the newsworthiness of the [work] at issue, which documented a . . .
      riot in Los Angeles, their mere rebroadcast was not in itself transformative . . .")(citing
26    *L.A. News Service v. Reuters Television Int'l*, 149 F.3d 987, 993 (9th Cir.1998)).

27  [20]  In its January 23rd article, Gawker merely quoted from and linked to another website's
      (*The Wrap*) mere summary of the Screenplay's plot, adding little to no additional insight.
28    Of course, adding commentary wouldn't be enough to avoid liability for complete use. *See*
      *Monge*, at 1176 ("Wholesale copying [even] sprinkled with written commentary," would
      be "at best minimally transformative" and still unlikely to be fair use (citation omitted)).

1 | literary work was in no way transformed thereby. *Campbell*, 510 U.S. at 579.

2 | **(3)   The Use Was Commercial**

3 | Although Gawker contends that its commercial purpose here may have been
4 | "incidental" to the Defendant's purported news reporting activity (Mtn to Dismiss at
5 | 17:11–13), such an argument "misses the point entirely. The crux of the
6 | profit/nonprofit distinction is not whether the sole motive of the use is monetary gain
7 | but whether the user stands to profit from exploitation of the copyrighted material
8 | without paying the customary price." *Harper & Row*, 471 U.S. at 562. That is very
9 | much the case here, as Gawker commercially benefitted from attracting "Here" its
10 | millions of readers who were seeking to gain access to a copy of the Screenplay.

11 | Gawker advertised itself as the very first source for the public to be able to
12 | obtain the entire Screenplay online, to Gawker's commercial advantage. Compl. ¶ 2.
13 | Gawker's unauthorized taking was part and parcel of its commercial ventures: gossip
14 | websites which are very well-funded by lucrative paid advertising. Because Gawker's
15 | "use" was admittedly of a commercial nature, this factor also therefore "tends to
16 | weigh against a finding of fair use." *Harper & Row*, 471 U.S. at 562 (use of excerpts
17 | in defendant's weekly news and politics periodical not fair use).

18 | **b.   The Nature of the Copyrighted Work Weighs Against**
19 | **a Finding of Fair Use**

20 | The Screenplay is a confidential, unpublished work of fiction, which "falls
21 | within the core of the copyright's protective purposes." *Campbell*, 510 U.S. at 586.

22 | **c.   The Amount and Substantiality of the Portion Used**
23 | **Weighs Against a Finding of Fair Use**

24 | Fair use inherently requires that the defendant utilize no more of a work than
25 | is reasonably necessary to "conjure up" the original. *Campbell*, 510 U.S. at 588. For
26 | instance, "were a book reviewer to quote . . . so much of the book as to make the
27 | review a substitute for the book itself, he would be cutting into the publisher's
28 | market, and the defense of fair use would fail." *Ty, Inc. v. Publ'ns Int'l Ltd.,* 292 F.3d

512, 517 (7th Cir. 2002).

Where, as here, the defendant claims that it was merely reporting factual information, fair use permits the use of only so much as is "necessary adequately to convey the facts." *Harper & Row*, 471 U.S. at 563. Gawker did not need to post in-line links to any portion — let alone the entirety as a downloadable PDF — of the Screenplay *at all* in order to effectively report to readers that the Screenplay had been leaked, or that an infringing copy was available elsewhere online.[21] Gawker linked to "much more than was necessary to corroborate its story." *Monge*, 688 F.3d at 1173, 1183 ("[N]ews reporting does not enjoy a blanket exemption from copyright . . . simply because they wish to report on the same events a work depicts;" no fair use where defendant's "reporting purpose could have been served through publication of . . . other sources rather than copyrighted photos" (citations omitted)). Because Gawker's links served no legitimate journalistic purpose and merely aided in the further pirating of Plaintiff's work, the third factor again weighs against fair use.

### d.   The Effect of Use Upon the Potential Market Weighs Against a Finding of Fair Use

With respect to the fourth fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work," Gawker argues that the sole market for the Plaintiff's Screenplay is among potential motion picture producers, and that Gawker's linking to infringing copies of the work does not give rise to potential harm to that market. 17 U.S.C. § 107(4). That argument is nonsensical in and of itself, in effect arguing that all written screenplays may be copied and disseminated under a fair use defense, that only a potential derivative audiovisual film work would be protected. If an unpublished screenplay becomes widely read by the public, there is no question that the ability for film makers (including, in this instance, Tarantino) to

---

[21] Almost laughably, Gawker submits that it *had* to link to the entire Screenplay because "Gawker could not create half of a hyperlink to avoid using more than necessary." Mtn to Dismiss at 21:13–14. Of course, they could have linked to a single page or, better yet, not at all, or included merely a screen grab image of the caption/title page or of the download page, with the URL redacted, versus providing and facilitating access to the entire work.

1  profit from a film based on it is significantly diminished, in this instance by millions

2  of dollars. In addition, Gawker entirely ignores that, as unequivocally alleged in the

3  Complaint, there also exists a substantial secondary market for the sale of published

4  copies of Tarantino's wildly popular screenplays as literary works *per se*. Compl. ¶

5  16. That Tarantino may not have made a movie out of the Screenplay is beside the

6  point because Gawker's non-transformative "use" supplants the commercial market

7  for such work, not only as a potential film, but as a published script. As explored

8  further above, if anyone were free to give away complete, downloadable copies of

9  Tarantino's movie scripts, then he would not be able to sell as many authorized,

10  published copies of those same works. *See A&M Records, Inc.*, 239 F.3d at 1017.

11       **E.**    **Motion to Dismiss Punitive Damages Should Not to be Granted**

12       Insofar as the motion seeks dismissal of Tarantino's prayer for punitive and

13  exemplary damages, the Plaintiff does not intend to pursue such remedy and will

14  amend his Complaint accordingly if the Court so desires. However, a Rule 12(b)(6)

15  motion "will not be granted merely because [a] plaintiff requests a remedy to which

16  he or she is not entitled." *Massey v. Banning United School Dist*., 256 F. Supp.2d

17  1090, 1092 (C.D. Cal. 2003) (citation and quotation omitted). "It need not appear that

18  plaintiff can obtain the specific relief demanded as long as the court can ascertain

19  from the face of the complaint that some relief can be granted." *Id*. (emphasis in

20  original) (citation and quotation omitted).

21  **V.**   **CONCLUSION**

22       For the foregoing reasons, Tarantino respectfully requests that Gawker's

23  motion to dismiss be denied in its entirety.

24  DATE: March 24, 2014            MARTIN D. SINGER
                                         EVAN N. SPIEGEL

25                                           HENRY L. SELF, III
                                         LAVELY & SINGER

26                                           PROFESSIONAL CORPORATION

27                                         By:    /s/ - Martin D. Singer
                                           MARTIN D. SINGER

28                                       Attorneys for Plaintiff
                                     QUENTIN TARANTINO