**LEVINE SULLIVAN KOCH & SCHULZ, LLP**
ROBERT PENCHINA (admitted *Pro Hac Vice*)
  rpenchina@lskslaw.com
321 West 44th Street, Suite 1000
New York, NY 10036
Telephone: (212) 850-6100
Fax: (212) 850-6299

THOMAS CURLEY (admitted *Pro Hac Vice*)
  tcurley@lskslaw.com
1899 L Street, N.W., Suite 200
Washington, DC 20036
Telephone: (202) 508-1138
Fax: (202) 861-8999

**JASSY VICK CAROLAN LLP**
KEVIN L. VICK, Cal. Bar No. 220738
  kvick@jassyvick.com
JEAN-PAUL JASSY, Cal. Bar No. 205513
  jpjassy@jassyvick.com
6605 Hollywood Boulevard, Suite 100
Los Angeles, California 90028
Telephone: (310) 870-7048
Fax: (310) 870-7010

Attorneys for Defendant
GAWKER MEDIA, LLC

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| QUENTIN TARANTINO,<br><br>           Plaintiff,<br><br>     v.<br><br>GAWKER MEDIA, LLC, et al.,<br><br>           Defendants. | Case No. CV 14-603-JFW (FFMx)<br><br>Judge: Hon. John F. Walter<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**<br><br>[Reply in Support of Request for Judicial Notice filed concurrently]<br><br>Date:    April 14, 2014<br>Time:    1:30 p.m.<br>Place:   Courtroom 16 |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ii

I.   THE COMPLAINT FAILS TO STATE A CLAIM FOR
     CONTRIBUTORY COPYRIGHT INFRINGEMENT ......................................2

II.  GAWKER'S USE WAS FAIR USE ..................................................................6

CONCLUSION ...............................................................................................................12

GAWKER MEDIA, LLC'S REPLY IN SUPPORT
OF MOTION TO DISMISS THE COMPLAINT

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).............................. 3, 6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)...................................2

*Brownmark Films, LLC v. Comedy Partners*,
   682 F.3d 687 (7th Cir. 2012) ...............................................................................7

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994)............................. 9, 10

*Leadsinger, Inc. v. BMG Music Publ'g*,
   512 F.3d 522 (9th Cir. 2008) ........................................................................ 6, 7

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*,
   964 F.2d 965 (9th Cir. 1992) ...............................................................................7

*Los Angeles News Serv. v. CBS*,
   305 F.3d 924 (9th Cir. 2002) ...............................................................................8

*Monge v. Maya Magazines, Inc.*,
   688 F.3d 1164 (9th Cir. 2012) ......................................................................... 8, 9

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) .............................................................................5

*Perfect 10, Inc. v. Giganews, Inc.*,
   No. CV11–07098 AHM, 2013 WL 2109963 (C.D. Cal. Mar. 8, 2013).......... 4, 5

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
   907 F. Supp. 1361 (N.D. Cal. 1995).............................................................. 4, 10

*Seltzer v. Green Day, Inc.*,
   725 F.3d 1170 (9th Cir. 2013) ......................................................................... 11

*Sony Corp. of America v. Universal City Studios, Inc.*,
   464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984)............................ 7, 9, 10

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
  802 F. Supp. 2d 1125 (C.D. Cal. 2011) .............................................................. 11

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
  No. CV 99-7654 HLH (BQRX), 2000 WL 525390 (C.D. Cal. Mar. 27, 2000)...9

*Warner Bros. Entm't, Inc. v. WTV Sys.*,
  824 F. Supp. 2d 1003 (C.D. Cal. 2011) ...............................................................4

GAWKER MEDIA, LLC'S REPLY IN SUPPORT
OF MOTION TO DISMISS THE COMPLAINT

1    Defendant Gawker Media, LLC respectfully submits this reply in further
2 support of its Motion to Dismiss the Complaint (Dkt. No. 23) ("Mtn.").
3    Tarantino may have a claim for direct infringement against Anonfiles.com
4 ("AnonFiles") for *its* posting of the script. Gawker had nothing to do with that
5 posting, and the Complaint asserts *no facts* to the contrary. Rather, the basis for
6 secondary liability against Gawker alleged in the Complaint is that Gawker "directed
7 *the general public* on where and how to obtain" the script "*after* the unauthorized
8 infringing copy of the Screenplay was uploaded and posted on AnonFiles.com."
9 Compl. ¶ 33 (emphasis added). But, the Complaint contains *no facts* showing even a
10 single infringement by a member of the general public who clicked on Gawker's
11 links. Thus, Tarantino's Opposition tries to misdirect the Court away from this fatal
12 deficiency by focusing on "extensive facts in support of *prima facie* claims for direct
13 copyright infringement" against AnonFiles. Opp. at 2. But, facts establishing a
14 direct infringement by AnonFiles are utterly irrelevant to Tarantino's claim that
15 Gawker contributed to infringements by the public *after* AnonFiles committed its
16 infringement. Likewise, AnonFiles' conduct is immaterial to whether *Gawker's* links
17 made fair use of the script.
18    The Opposition does not cite even a single case in which an entity engaged in
19 the business of reporting news, like Gawker, has been found to be infringing because
20 its news report included a link to allegedly infringing material that was the subject of
21 the report. Short on actionable facts and supporting law, the Opposition attacks the
22 nature of Gawker's reporting—going so far as to ludicrously claim that Gawker
23 "fabricated" the news story that Tarantino himself put in motion. *Id*. As reflected by
24 the vitriol in his papers, Tarantino's claim against Gawker is animated by his
25 displeasure with Gawker's past and present reporting about him, rather than the
26 possibility that some unknown persons may have accessed his script online. Seeking
27 to hold off dismissal, Tarantino wishfully asserts that "Motions to Dismiss Under
28 Rule 12(b)(6) Are Disfavored." *Id*. at 5. That is only true among plaintiffs with

-1-

spurious claims like Tarantino's here. The Supreme Court has made clear that, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007). Tarantino may have a legitimate beef with AnonFiles, and he can continue to pursue that claim. He has no legal or factual basis for his claim against Gawker.

### I. THE COMPLAINT FAILS TO STATE A CLAIM FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT

A motion to dismiss is intended to test the sufficiency of a plaintiff's complaint, not his opposition brief. Although his brief suggests otherwise, Tarantino did *not* pursue a claim of direct infringement against Gawker in the Complaint. Tarantino instead asserted a single claim for *contributory* copyright infringement against Gawker. And, notwithstanding the shrillness of Tarantino's attacks on Gawker, contributory infringement is not an open-ended tort vehicle through which a prominent film director may attempt to punish journalism of which he so obviously disapproves.[1] He is still obligated to plead *facts* in his Complaint establishing a cognizable claim, specifically facts identifying a primary infringement to which Gawker allegedly contributed. *See* Mtn. at 5-8 (collecting authorities dismissing contributory infringement claims).

---

[1] Plaintiff's attacks cannot obscure the following: (1) Tarantino himself circulated his script to individuals who disseminated it; (2) Tarantino then solicited media coverage to announce that the script was being circulated and that he would no longer make the film as a result; (3) the media widely covered Tarantino's remarks; (4) the script was available on the Internet prior to Gawker's publication of the hyperlinks at issue; and (5) Gawker merely encouraged its audience to "read" the script. Mtn. at 2-4; *see also* Compl. ¶¶ 16-19. To be sure, Tarantino is back peddling now—going so far as to object to consideration of his own public remarks about the script's widespread dissemination. *See* Opp. to RJN (Dkt. No. 27). But these events, and Plaintiff's own role in them, are not in dispute.

The Opposition ignores that all of Plaintiff's allegations against Gawker purporting to demonstrate liability are made only upon "information and belief." Compl. ¶¶ 18-19, 33-34. This is insufficient under *Iqbal* and its progeny, *see* Mtn. at 8-9, absent factual allegations providing the bases for such beliefs. Moreover, in the Complaint, Plaintiff's contribution theory is predicated entirely upon the allegation that Gawker was "facilitating and encouraging *the public's violation* of Plaintiff's copyright in the Screenplay" by providing links to copies that someone else posted to AnonFiles and Scribd.com ("Scribd"). Compl. ¶ 2 (emphasis added); *id*. ¶¶ 19, 33; *see also* Opp. at 1.

Yet, notwithstanding Tarantino's histrionic allegations of innumerable theoretical infringements to which Gawker may have allegedly contributed, Plaintiff does not identify a single act of direct infringement in his Complaint committed by any member of the general public to which secondary liability could attach. Indeed, the Opposition grudgingly acknowledges that he cannot do so. *See* Opp. at 9 ("the Complaint may not explicitly identify one particular, known individual who downloaded or printed copies of the Screenplay").[2] Thus, the Opposition engages in utter speculation, suggesting that "a person making a printout or re-posting a copy of the [Screenplay] on another website would infringe plaintiff's copyright." *Id.* at 9. While that may or may not be true (depending on the circumstances), the Complaint does not identify a single instance where that actually occurred. In sum, the Complaint provides no facts showing that anyone clicked the hyperlinks in Gawker's report or downloaded the script, let alone engaged in an act of infringement, as opposed to just "read[ing] the Screenplay" as Gawker was "encouraging" them to do. Compl. ¶ 2.

---

[2] In his opposition, Tarantino criticizes Gawker for "obstreperously" failing to remove the links on its website to AnonFiles and Scribd "to this day." Opp. at 12. In truth, as Plaintiff is no doubt aware but did not mention, the original content Gawker linked to in its news article has long since been removed.

-3-

1    Lacking any facts demonstrating that a member of the public infringed his
2 script as a result of Gawker's links, Tarantino argues that there must have been
3 infringement because the script was "made available to Internet users via
4 AnonFiles.com only in a PDF format," and "anyone who clicked Gawker's links to
5 read it thereby necessarily must have (even inadvertently) made an automatic copy of
6 the work on their own computer." Opp. at 4, 8.[3] This argument based on file format
7 identifies a distinction which makes no legal difference and cannot resurrect
8 Tarantino's defective claim.

9    First, irrespective of what format a user might ultimately have had access to
10 through the links, the Complaint lacks facts indicating that any member of the public
11 actually *did* click on Gawker's links and took advantage of that access. Second, to
12 the extent a person "inadvertently" made a copy, or their computer 'automatically"
13 did so, it would not constitute an infringement because infringement requires a
14 volitional act of copying. *See, e.g.*, *Religious Tech. Ctr. v. Netcom On-Line*
15 *Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995) ("Although
16 copyright is a strict liability statute, there should still be some element of volition or
17 causation . . . ."); *Perfect 10, Inc. v. Giganews, Inc.*, No. CV11–07098 AHM (SHx),
18 2013 WL 2109963, at *7-8 (C.D. Cal. Mar. 8, 2013) (same).[4]

---

[3] Plaintiff castigates Gawker for failing to acknowledge this purportedly "crucial[]" PDF format distinction, going so far as to declare it a "seeming[] fabricat[ion]." Opp. at 8-9 & n.3. Concededly, Gawker's Motion to Dismiss was focused upon the allegations that can actually be found in Tarantino's 14-page Complaint, where this suddenly "crucial[]" PDF theory of liability is absent. Plaintiff now dubiously implies that a PDF copy of the script in its entirety was created merely by clicking on Gawker's website alone—with no further action required by any user on the AnonFiles website to access the script. *See* Opp. at 8-9 & n.3. That implication is false, and the Complaint itself makes no such allegation. Instead, the Complaint makes clear that Gawker did *not* publish the leaked screenplay on its website. Rather, the Gawker report included hyperlinks to the pages on AnonFiles and Scribd where the screenplay could then be accessed. *See* Comp. ¶¶ 18, 33.

[4] *But see Warner Bros. Entm't, Inc. v. WTV Sys.*, 824 F. Supp. 2d 1003, 1011 n.7 (C.D. Cal. 2011).

-4-

1    Third, irrespective of format, accessing an allegedly infringing copy of a work
2    on one's own computer for the limited purpose of viewing that work does not
3    constitute an actionable direct infringement to which contributory liability could
4    attach.  As the Ninth Circuit made plain: "[E]ven assuming such automatic copying
5    could constitute direct infringement, it is a fair use in this context.  The copying
6    function performed automatically by a user's computer to assist in accessing the
7    Internet is a transformative use.  . . .  It is designed to enhance an individual's
8    computer use, not to supersede the copyright holders' exploitation of their works."
9    *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007);  *see*
10   *also* Mtn. at 6-7.[5]

11   Unable to substantiate the "general public" theory of contributory liability he
12   tried to plead, Tarantino now also contends that Gawker supposedly contributed to
13   the primary infringement of uploading the script to AnonFiles in the first instance.
14   Opp. at 7-8.  This argument is belied by the well-pleaded facts in his Complaint.  The
15   Complaint affirmatively alleges that Gawker's publication came only "*after* the
16   unauthorized infringing copy of the Screenplay was uploaded and posted" to
17   AnonFiles, when Gawker published a follow up to its original story, reporting that,
18   since Gawker's first report, "a document that appears to be the script has been made
19   public online."  Compl. ¶¶ 19, 33 (emphasis added).  Indeed, the Opposition confirms
20   that Gawker "contributed to the infringing conduct of DOE-1 a/k/a AnonFiles.com
21   and DOES 2-10" only *after* the alleged primary infringement, supposedly "by driving
22   traffic to their websites."  Opp. at 7.  In short, it was only after Tarantino's script was
23   posted on AnonFiles (the only direct infringement alleged in the Complaint) that

---

[5] Plaintiff cannot overcome *Perfect 10*, so he suggests in a footnote that Gawker has misstated the significance of the Ninth Circuit's language—without explaining how its import here could be misconstrued.  *See* Opp. at 8-9 & n.3.  The cases involving music and film sharing websites relied on by Tarantino, *id.* at 10-11, are simply not analogous to the circumstances in this action of a news organization including hyperlinks to the source material it was reporting about.

-5-

Gawker published a link to the script. By definition, Gawker could not have contributed to this infringement; it occurred prior to Gawker's allegedly wrongful conduct.

Finally, Tarantino asserts in a wholly conclusory fashion that Gawker bears responsibility for the initial posting of his script by the other defendants. *See id*. at 4 ("Tarantino contends that Gawker intended to and did directly cause, contribute to, enable, facilitate, aid, abet, induce and/or participate in the infringement of Tarantino's copyrighted work committed by defendant DOE-1 a/k/a AnonFiles.com, and the other Doe defendants, whose identities are currently unknown."); *see also id*. at 7. There are no non-conclusory facts pled in the Complaint itself, however, plausibly giving rise to such a contention. *See* Mtn. at 4 n.1; *see also* Compl. ¶ 18. Nor may Tarantino avoid dismissal by simply positing that "through discovery" he may be able to establish such facts. Opp. at 12; *see, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009) (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

## II. GAWKER'S USE WAS FAIR USE

Tarantino fares no better in his attempts to refute Gawker's fair use arguments; instead, he merely feigns the role of a newsroom editor, asserting that Gawker's use "served no legitimate journalistic purpose" and "Gawker could just as effectively have reported the fact that the script was leaked and available . . . without including any specific links." Opp. at 2, 21. That, however, is not the standard. If it were, then fair use might never apply because one could almost always discuss or refer to the original work rather than use it.

Tarantino mistakenly contends that it is "premature and inappropriate" to address fair use on this motion. *Id*. at 13. He completely ignores the Ninth Circuit's pronouncement that an "assertion of fair use may be considered on a motion to dismiss." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008).

1  He also does not meaningfully address the multiple cases cited by Gawker that
2  applied a fair use defense on a motion to dismiss. *See* Mtn. at 11-12 (same) (listing
3  cases). And, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir.
4  2012), a case on which Tarantino relies, Opp. at 13 n.9, strongly supports considering
5  Gawker's fair use argument at the outset.[6]

6        Tarantino asserts that, to assess fair use, it is inappropriate to look at the
7  conduct of the alleged contributory infringer and only the actions of the direct
8  infringer should be analyzed. *Id*. at 14. Tarantino bases this argument almost
9  entirely on *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F.2d 965 (9th
10 Cir. 1992), but even Tarantino acknowledges that the Ninth Circuit subsequently
11 characterized that case's "entire fair use analysis . . . as 'dicta.'" Opp. at 14 n.11.
12 Tarantino has no answer to the line of cases applying the fair use analysis to the
13 alleged contributory infringers' actions, *see* Mtn. at 11-12, so his Opposition simply
14 ignores them.

15       Tarantino is not helped by his reliance on *Sony Corp. of America v. Universal*
16 *City Studios, Inc.*, 464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984), or other
17 cases that did focus on the conduct of a primary infringer. Opp. at 14. It is
18 fundamental that there can be no contributory infringement absent a direct
19 infringement. It does not matter whether there is no direct infringement because the
20 primary infringer simply did not copy the original, or because his copying amounted
21 to a fair use—either way, if there is no direct infringement there can be no secondary
22 infringement. Because the alleged primary infringers in *Sony*—the home viewers—
23 made fair use of plaintiffs' works, there was no need to examine whether the alleged
24 contributory infringer's actions also were fair. Nothing in *Sony* or the other cases

---

[6] In *Brownmark*, the Seventh Circuit, without any discovery taking place, held that a defendant's use of the "heart" of a creative work was a fair use. 682 F.3d at 693-94.

-7-

cited by Tarantino foreclose application of the fair use doctrine to the actions of the alleged contributory infringer.

Tarantino's Opposition does not refute that Gawker's report was a fair use. Tarantino repeatedly suggests that "'[n]ews reporting does not enjoy a blanket exemption from copyright.'" Opp. at 24 (quoting *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1173 (9th Cir. 2012)); *see also, e.g.*, Opp. at 21. Gawker did not argue otherwise. Rather, news reporting enjoys a presumption of being a favored purpose in the analysis of the first fair use factor. *See* Mtn. at 12. Tarantino did not and could not challenge that specific proposition. Instead, he argues that Gawker was not engaged in "*bona fide* news reporting because the links alone served no legitimate journalistic purpose." Opp. at 21. This assertion is frivolous. Gawker did not publish "the links alone," but included the links within the context of a report. Although there may have been other ways in which the report could have been written, there can be little doubt that Gawker was engaged in reporting news. *See, e.g.*, *Monge*, 688 F.3d at 1173 ("We have little doubt that the gossip magazine's sensational coverage of the wedding qualifies as news reporting.").

Tarantino's arguments do not undercut the transformative nature of Gawker's use. Although, in some circumstances, a "difference in purpose is not quite the same thing as transformation," Opp. at 22, the Ninth Circuit has nonetheless found fair use even where a news organization "cannot be said to have added anything new" to the underlying work but where its purpose in using the work was different from the copyright owner. *See Los Angeles News Serv. v. CBS*, 305 F.3d 924, 938-940, *opinion amended and superseded on other grounds*, 313 F.3d 1093 (9th Cir. 2002). Gawker built upon the original by placing it in the context of Gawker's added original reporting. *See* RJN, Ex. B. Gawker's use in no way superseded the object of the original—to make a movie.[7]

---

[7] Plaintiff's reliance on cases finding no fair use when the original work "is merely retransmitted" is misplaced. Opp. at 22. Gawker's use of the script was not

-8-

Likewise, Tarantino's reliance on *Monge v. Maya Magazines, Inc*. is misplaced. *See* Opp. at 22 n.18 (citing *Monge*, 88 F.3d at 1175-76). In *Monge*, plaintiffs had *avoided* media coverage about their wedding, which was the subject of the copyrighted pictures at issue in the suit. 688 F.3d at 1169 ("[T]he couple went to great lengths to keep the wedding a secret."). The pictures themselves were not the news nor subject of a preexisting controversy when the magazine published its article featuring the pictures. *Id.* at 1175. In contrast, the fact that the script had appeared online was itself the news. And, far from attempting to keep the script secret, Tarantino voluntarily distributed the script to others and then sought out press coverage when it leaked. *See, e.g.*, RJN, Ex. C.[8] Thus, as the Complaint makes abundantly clear, Tarantino himself made a controversy out of the script and its leak. *See* Compl. ¶ 16 ("Plaintiff . . . stated publicly – in an interview that was widely reported in the media"); *id.* ¶ 17 (noting that Gawker published an article about "Plaintiff's public statements on the matter").

Tarantino incorrectly asserts that "'[e]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright.'" Opp. at 15 (quoting *Sony Corp. of Am.*, 464 U.S. at 451). That has not been the law for twenty years. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584, 114 S. Ct. 1164, 1174, 127 L. Ed. 2d 500 (1994)

---

a retransmission at all; instead, Gawker, in the process of reporting the news, merely told readers where the subject of the news was. Gawker itself retransmitted nothing. *See, e.g., Ticketmaster Corp. v. Tickets.Com, Inc.*, No. CV 99-7654 HLH (BQRX), 2000 WL 525390, at *2 (C.D. Cal. Mar. 27, 2000) ("[H]yperlinking does not itself involve a violation of the Copyright Act (whatever it may do for other claims) since no copying is involved. The customer is automatically transferred to the particular genuine web page of the original author. . . . This is analogous to using a library's card index to get reference to particular items, albeit faster and more efficiently.").

[8] Plaintiff's Opposition now intermittently refers to his work as a "confidential Screenplay," *e.g.*, Opp. at 1, 16, 20, 23, but the Complaint contains no allegations that Tarantino imposed any confidentiality restrictions when he circulated the work.

-9-

(holding that "*Sony* itself called for no hard evidentiary presumption"); *see also* Mtn. at 16 ("[E]ven uses that are commercial are not presumptively unfair." (citing *Campbell*, 510 U.S. at 584)). Moreover, Tarantino is simply wrong when he asserts that Gawker's use was not fair because the use "was part and parcel of its commercial ventures." Opp. at 23. If that were so, the rule would "swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities 'are generally conducted for profit in this country.'" *Campbell*, 510 U.S. at 584 (citation omitted).

In an effort to make Gawker's use appear to be more commercial, Tarantino falsely states that "Gawker advertised itself as the very first source" for Tarantino's script. Opp. at 23. Gawker, however, ran no such advertisements—and there are no allegations to the contrary in the Complaint. And, nothing in Gawker's news report or anything else published by Gawker indicates that Gawker was the first source for the script. Indeed, *prior* to Gawker's report, another news outlet already reported that it obtained the script and "Hollywood assistants are now promulgating a link anyone can use to download a PDF of the script." RJN, Ex. D.

Tarantino argues that Gawker used too much of his work to qualify as a fair use, Opp. at 23-24, but at the same time he is forced to acknowledge, as he must, that "Gawker did not actually 'use' the script." *Id.* at 14 (quoting Mtn. at 20). He contends that Gawker "could have linked to a single page." Opp. at 24 n.21. But, that would have required Gawker to copy at least part of Tarantino's work— something that Gawker *did not* do. Gawker did not reproduce any part of the script but merely linked to "exactly what was [already] posted" by someone else. *Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. at 1379-80 (finding fair use where alleged contributory infringer linked to entire work).

Tarantino does not and cannot deny that the primary purpose, and thus the primary market, for his screenplay is to make movies, that "everyone eventually posts

-10-

[his script and] gets it . . . on the net," RJN, Ex. C at 2, or that "'there is no reasonable argument that conduct of the sort engaged in'" by Gawker "'is a substitute for the primary market'" for Plaintiff's screenplay. Mtn. at 23 (quoting *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013)).

In sum, none of Tarantino's arguments in opposition to Gawker's fair use defense are the least bit colorable. Instead, Tarantino misconstrues, misunderstands, and misstates both the applicable case law and Gawker's arguments.

To the extent that the Court determines that it is appropriate to apply the fair use analysis only to the conduct of the primary infringer, fair use still should be found. Tarantino's Opposition purports to analyze whether the initial posting made by AnonFiles may be fair use, and argues that it is not. Tarantino, however, has aimed his argument at the wrong target. As discussed above, the primary infringements that the Complaint alleges Gawker contributed to are the unknown but theoretically possible infringements committed by members of the public who accessed the script via Gawker's links—*not* the initial posting to AnonFiles that occurred prior to Gawker's report. Thus, Tarantino's arguments about whether AnonFiles made a fair use are simply beside the point.

Tarantino does not contest that Gawker's readers merely "had access to the script to supplement their news consumption" and their "use is a transformative, non-commercial use" that qualifies as fair use. Mtn. at 17-18. Because Tarantino's Opposition does not contest that Gawker's readers made fair use, the Court should conclude that there was no primary infringement and, thus, no contributory infringement by Gawker. *See, e.g.*, *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("'failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue.'" (citation omitted)).

-11-

# CONCLUSION

For the foregoing reasons as well as those set forth in its opening memorandum, Gawker respectfully requests this Court to grant its Motion to Dismiss the Complaint as against it, enter judgment in its favor and against Plaintiff, and award to Gawker Media, LLC its costs and attorneys' fees.

DATED:  March 31, 2014

LEVINE SULLIVAN KOCH & SCHULZ, LLP
ROBERT PENCHINA *
THOMAS CURLEY *

JASSY VICK CAROLAN LLP
KEVIN L. VICK
JEAN-PAUL JASSY


By:   /s/    Robert Penchina

ROBERT PENCHINA

Attorneys for Defendant
GAWKER MEDIA, LLC

* admitted *Pro Hac Vice*